525 So.2d 746 (1987)
UHS-QUALICARE, INC., UHS of the Gulf Coast, Inc., and Qualicare Sub., Inc., et al.
v.
GULF COAST COMMUNITY HOSPITAL, INC., Safecare Company, Inc., S.C. Longview, Inc., Stephen R. Jepson, J. Stephen Wright, and Larry W. Wells.
No. 56389.
Supreme Court of Mississippi.
August 19, 1987.
*747 George P. Hewes, III, J. Perry Sansing, Brunini, Grantham, Grower & Hewes, Jackson, Floyd J. Logan, Alben N. Hopkins, Hopkins, Vaughn & Anderson, Gulfport, James Nespole, Glen Banks, Reavis & McGarth, New York City, for appellants.
William M. Rainey, Franke, Rainey & Salloum, Gulfport, Christopher I. Brain, William H. Block, Seattle, Wash., for appellees.
Before WALKER, C.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This declaratory judgment action arises out of a hospital management contract. The hospital drew first blood as it secured a trial court declaration that it had lawfully terminated the contract by reason of the manager's material breaches. We reverse and render, holding the breaches not sufficient to support the radical remedy of termination, for the reason that the contract vested in the hospital authority to cure immediately.

II.

A.
Gulf Coast Community Hospital was built in 1976 in Biloxi, Mississippi. The hospital was financed and built by Safecare Company, Inc. ("Safecare") for a group of local physicians. After completion the hospital was leased to Charter Medical, a hospital management company. By 1979 Gulf Coast was in serious financial difficulty. In March of 1980 a joint venture was formed between Safecare and Qualicare of Louisiana, Inc. ("Qualicare") which promptly acquired the hospital in March of 1980. Pursuant to the joint venture agreement, Safecare and Qualicare each acquired a fifty percent stock interest in Gulf Coast Community Hospital, Inc. ("Gulf Coast") which in turn owned the hospital.
On March 1, 1980, Gulf Coast entered into a twenty year management contract with Qualicare. The contract provided that Qualicare would manage the hospital. For its services Qualicare would be paid a monthly fee based on gross revenues.
The management contract delineates the duties and prerogatives of both Qualicare, as the manager/co-owner, and Gulf Coast, referred to in the contract as the "corporation." Article III of the Management Agreement is entitled "RIGHTS AND DUTIES OF MANAGER" and provides in part:
(D) Manager shall prepare an annual budget for the Facility ... and shall cause the budget to be presented to the Corporation prior to the commencement of each fiscal year for its acceptance, rejection, or modification. Upon adoption of such budget, or any modification thereof, by the Corporation, such budgets shall serve as a guide for the operation of the facility during the ensuing year.
In Article IV, which is entitled "RIGHTS AND DUTIES OF THE CORPORATION DURING THE TERM OF THIS AGREEMENT," the contract states:
The Corporation has reserved the right to make all management and policy decisions specifically including the right to set the Corporation's admission policies and fee structures.
In Article VIII, there appears a termination clause which reads as follows:

*748 (C) If Manager shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager, and such default shall continue for a period of thirty (30) days after written notice thereof by Corporation to Manager, then in case of any such event and upon the expiration of the aforesaid thirty (30) day period, this Agreement shall terminate at any time thereafter upon notice to Manager by the Corporation in writing.
The hospital operated under joint Qualicare/Safecare ownership and Qualicare management until 1983. In January of 1983, Qualicare reached an agreement with United Health Services, Inc. ("UHS") for the sale to UHS of Qualicare's interest in Gulf Coast. UHS formed a subsidiary corporation, UHS-Qualicare, Inc. ("UHS-Qualicare"), to serve as a vehicle through which acquisition could take place. Effective May 29, 1983, UHS-Qualicare succeeded to all of the rights, assets and liabilities of Qualicare and became owner of fifty percent of the stock of Gulf Coast. UHS-Qualicare also succeeded to Qualicare's position as manager of Gulf Coast Community Hospital.
Gulf Coast's budget for fiscal year 1983 was already in effect at the time of this acquisition. That budget assumed an average daily census (average number of patients per day) of 103. With this census, the hospital had a projected "bottom line" profit of $2,200,000.00. The budget also contained a "variable budget," outlining the hospital's financial prospects if the census was not 103, but rather was 95. Under a 95 census, the budget projected a profit of $1,426,000.00 for the year. By the end of May, 1983, the average daily census was running around 93, and the accrued profit for the first five months was approximately $667,000.00. Under the variable budget portion of the Board-approved budget, outlining the course the hospital would take under a 95 census, the profit for five months (5/12 of total income) had been projected to be $600,000.00.
Here the recitation of the facts in the briefs of the parties degenerates into a series of charges and counter charges. A few basics, however, appear beyond dispute. In June of 1983, UHS-Qualicare, as manager, increased the rates charged patients from $654.00 per patient day to $738.00 per patient day. This rate increase was designed to achieve a 38 percent gross profit margin, substantially higher than the 26 percent contained in the Board-approved budget. UHS argues that this was necessary to maintain the bottom line of the $2.2 million dollar profit projected in the Board-approved budget. The scheduled June 1 increases were put off until a new budget could be developed. That was done and was completed on June 16, 1983. All increases were imposed between June 19 and June 29, 1983. The Board of Directors was not informed of the changes nor was its approval sought.
On June 16, 1983, Safecare  as distinguished from Gulf Coast  wrote to UHS insisting that it be consulted with respect to all rate changes. It is highly significant, as will appear later, that this is a letter from one 50 percent owner, Safecare Company, Inc., to the other 50 percent owner, United Health Services, Inc.[1]
June and July, 1983, were months of increasing disenchantment among the new *749 joint venturers. A series of moves and counter moves took place, each party jockeying to improve its strategic position. Quite apparently, little thought was being given to patient care at the hospital. Be that as it may, the critical event was the July 12, 1983, resignation of A. Russell Chandler from the Board of Directors. Prior to that time, the Board had consisted of six members, three "controlled" by Safecare and three "controlled" by UHS-Qualicare. Chandler had been president of the original Qualicare, the party which sold its interest to UHS. Reading between the lines, one may assume that, his company out of the picture, Chandler simply wanted no part of the imminent warfare. In any event, on July 12, 1983, Chandler resigned from Gulf Coast's Board.
In rapid fire succession, the three Safecare directors elected one of their own, Thomas L. Haywood, to succeed Chandler. Thereafter, the two remaining UHS-Qualicare directors were removed so that, following the massacre, Gulf Coast's Board of Directors consisted of four persons, all loyal to Safecare.[2] Gulf Coast, a/k/a Safecare, concedes in its brief that these changes were made to preserve its "power to make management and policy decisions reserved to it by the Management Contract," a preservation which will acquire considerable significance as we proceed.
On the same day, July 12, 1983, Gulf Coast, acting through its newly elected president, J. Stephen Wright, declared the Management Agreement terminated in a letter addressed in triplicate to Qualicare of Louisiana, Inc., the original manager, to UHS-Qualicare, Inc., the successor manager, and to United Health Services, Inc., the parent company of UHS-Qualicare.[3] The *750 termination letter is vague and general. Gulf Coast complains that UHS-Qualicare "has made changes in the operation of the Hospital which are materially detrimental." Noted generally are "certain changes in the fee structure of the Hospital." Gulf Coast declares these "as material breaches to the Management Contract" and then declares the contract terminated. No reference is made to UHS-Qualicare being given any opportunity to cure the alleged breaches. No reference is made to the thirty day notice provision of Section VIII(c) of the Management Contract.
Most significant of all is that the sun set on July 12, 1983, without the Safecare-controlled Gulf Coast Board of Directors having taken any action to reestablish the $654.00 per patient day rate or to reverse *751 or alter any other action taken by UHS-Qualicare.
After these moments of certainty, matters again degenerated. During the remainder of July and early August, the record reflects various communications, written and verbal, telephonic and in person, between Safecare and UHS-Qualicare representatives. Each claims that it was being reasonable and the other unreasonable and evasive. Importantly, UHS-Qualicare insists that it offered to roll back the rates. Objectively viewed, the roll back discussions amounted to a cat and mouse game, each party changing its role at whim.
During this period of time, it should be noted, the principal officers of Safecare, J. Stephen Wright and Stephen R. Jepson, were wearing two hats. Wright was senior vice president of Safecare Company, Inc. and was chairman of the board and president of Gulf Coast Community Hospital, Inc. Jepson was vice president of Safecare Company, Inc. and vice president of Gulf Coast Community Hospital, Inc. Although the July 12 letter was written by Wright in his capacity as chairman of the board and president of Gulf Coast, it appears for all practical purposes that throughout he was acting primarily in the interest of his principal employer, Safecare.
In any event, by the middle of August, 1983, one thing was clear: the rates had not been rolled back. Safecare had not insisted that the rates be rolled back. The Gulf Coast Board of Directors, which were all Safecare-loyal individuals, had not ordered the rates rolled back. Nor had UHS-Qualicare taken any action to reduce the rates, offering the rather lame excuse that such might be taken as "admission of a breach."
On August 15, 1983, Safecare, per J. Stephen Wright, addressed a letter to UHS asserting that the joint venture relationship between the two companies had been "irreparably damaged" and stating its "intense desire ... to arrange for a division of our mutual interests."[4] The letter went on to state that suit would be filed immediately "to declare the Management Agreement terminated." Safecare stated "We are placing our efforts and hopes on settlement ... the legal actions are merely protective devices should settlement prove impossible." Also on August 15, 1983, Jepson, on behalf of the hospital Board, again announced termination of the Management Contract, citing additional alleged material breaches.[5]

*752 B.
The following day, August 16, 1983, Gulf Coast commenced the present civil action in the Circuit Court of Harrison County, Mississippi. The complaint sought a declaratory judgment that the Management Contract of March 1, 1980, had been breached and had been effectively terminated. Named as Defendants were UHS-Qualicare, Inc., and two other related corporations.
UHS-Qualicare answered, denying the breaches and asserting various affirmative defenses. UHS-Qualicare filed a counterclaim and joined as Counter-Defendants Safecare and its several officers, alleging tortious interference with the Management Contract, breach of fiduciary duties and assorted other sins and omissions.
The matter was called for trial on April 7, 1984, with the Circuit Court sitting without a jury. On June 5, 1984, the Circuit Court filed its "Opinion and Findings of Fact" wherein it found without elaboration "that the raising of the rates by the Defendant, UHS-Qualicare, Inc., was a material breach of contract."
The Court stated further that
The Court cannot imagine anything more vital to a hospital than control of its rates. Here we have a substantial increase without consent of the hospital. The implementation of a new budget without Board approval was in aid of the rate raise. These two matters in the opinion of the Court are substantial and material breaches and have not been cured.
*753 Turning to the matter of notice of default and opportunity for cure, the Court stated that it was "of the opinion that a more explicit notice of default could have been given; nevertheless, ample notice was given, at least thirty days prior to the filing of the suit and for some time the Defendant was aware of the claim of default."
Thereafter the Circuit Court entered declaratory judgment in favor of Gulf Coast Community Hospital, Inc., and against UHS-Qualicare, Inc., et al. The Counterclaim was dismissed. This appeal has followed.

III.
Our procedural law authorizes courts of record to declare the rights, status and other legal relations of parties. Rule 57(a), Miss.R.Civ.P. The declaratory judgment procedure is particularly available in cases where an interested party seeks to determine his status under a "written contract or other writings constituting a contract." Rule 57(b)(1), Miss.R.Civ.P. The rule further provides that "a contract may be construed either before or after there has been a breach thereof." Rule 57(b)(2), Miss.R. Civ.P. See Bourn v. Tomlinson Interests, Inc., 456 So.2d 747 (Miss. 1984) (declaratory judgment granted to construe a deed).
The Official Comment to Rule 57 provides that
The two principal criteria guiding the policy in favor of rendering declaratory judgments are: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.
It is not at all clear that final resolution of the present action will terminate the controversy between these parties. No matter. We perceive that enough peace, if not good will, may be wrought by the present proceedings that the court ought "to do what it can do to lay to rest what part of the controversy it can." In Re Validation of $7,800,000.00 Combined Utility System Bond, 465 So.2d 1003, 1015 (Miss. 1985); see also Frazier v. State By and Through Pittman, 504 So.2d 675, 705-06 (Miss. 1987); Alexander v. State By and Through Allain, 441 So.2d 1329, 1346-47 (Miss. 1983).
When a party to a contract dispute commences a civil action for declaratory judgment, that party will no doubt set forth the meaning, construction and effect it wishes that the court will declare the contract to have. The court, however, is not limited to accepting the plaintiff's version of the contract or dismissing the action. See Peterson v. Sandoz, 451 So.2d 216 (Miss. 1984). Rather, the court should apply controlling principles of law to the facts as developed and declare the rights, status or other legal relations of the parties as may be mete and proper under the circumstances.

IV.
A word about our scope of review. As all know, our scope of review of factual determinations made by a trial judge sitting without a jury is limited. We alternatively and without a great deal of thought refer to the rule interchangeably as the substantial evidence rule or the manifest error rule.
Employing substantial evidence parlance, we have said repeatedly that we will not disturb a trial judge's findings of fact where there is in the record substantial evidence supporting the same. Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983); Culbreath v. Johnson, 427 So.2d 705, 707-09 (Miss. 1983); Richardson v. Riley, 355 So.2d 667, 668 (Miss. 1978). This is so whether those findings relate to matters of evidentiary fact or of ultimate fact. Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985).
On the other hand, we have often stated that the findings of fact of a trial court should and must be accepted unless they are manifestly wrong. McDaniel Brothers Construction Co. v. Jordy, 195 So.2d 922, 924 (Miss. 1967); Pearson v. Weaver, 252 Miss. 724, 173 So.2d 666, 668 (1965); United *754 States Fidelity & Guaranty Co. v. State For the Use of Ward, 211 Miss. 864, 53 So.2d 11, 14 (1951). The congruence of these two approaches is found in our several cases which employ a "clearly erroneous" standard for review of findings of fact. See, e.g., Evans v. Continental Grain Co., 372 So.2d 265, 268-69 (Miss. 1979); Gerard v. Gill, 195 Miss. 726, 732, 15 So.2d 478, 480 (1943). A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.
Of course, no such limitations apply when we are reviewing questions of law. Boggs v. Eaton, 379 So.2d 520, 522 (Miss. 1980); see also Pullman-Standard, A Division of Pullman, Inc. v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 79 (1982). This Court, as a matter of institutional necessity and constitutional imperative, is the ultimate expositor of the law of this state. Notwithstanding our respect for and deference to the trial judge, on matters of law it is our job to get it right. That the trial judge may have come close is not good enough.

V.
We are confronted today with a problem of private lawmaking. The primary rules regulating the rights and responsibilities of the parties are those of the Management Agreement of March 1, 1980. Public law merely furnishes tools whereby we may assign meaning to the primary law made by the parties.
It is said that the first rule of contract interpretation is to give effect to the intent of the parties. Sumter Lumber Co. v. Skipper, 183 Miss. 595, 608, 184 So. 296, 298 (1938). More correctly stated, our concern is not nearly so much what the parties may have intended as it is with what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy. This is particularly so where, as here, one of the parties, UHS-Qualicare, was not a party to the original contract. As explained above, UHS-Qualicare has succeeded to the position of an original contracting party.
Where what the parties have said is less than clear and definite in material part, the court may resort to extrinsic aids to assign meaning to contract terms. Barnett v. Getty Oil Co., 266 So.2d 581, 586 (Miss. 1972). We are told that one of those extrinsic aids should be the construction which the parties themselves have given to a contract in the course of their life together under it.[6]See Sumter Lumber Co. v. Skipper, 183 Miss. at 608-09, 184 So. at 298-99; Restatement (Second) of Contracts § 202(4) (1981). Here again we have a rule which is of little benefit here, for UHS-Qualicare did not become a successor party to the contract until April 29, 1983, less than two months prior to the date on which it is said to have breached the contract.
We have before us the Circuit Court's finding of fact that the raising of the rates by UHS-Qualicare from $654 per patient date to $738 per patient day was "a material breach of contract." Regretably, however, we are offered no analysis of the terms and provisions of the contract whereby the trial judge has given us his views regarding the precise term that has been breached. By resort to the briefs of the parties, we may assume that here the Circuit Court had reference to Article III(d) regarding the budget and Article IV regarding the rate or fee structure.
We begin with Article IV which in relevant part provides:
The corporation has reserved the right ... to set the corporation's admission policies and fee structures.
*755 The one thing we regard clear about this language is that under the contract Gulf Coast, not UHS-Qualicare, or whoever the manager or successor manager may be, has ultimate authority with regard to "fee structures." In their arguments before this Court, both parties chase the same rabbit. They rage regarding whether UHS-Qualicare as manager could raise the rates qua fee structure without prior approval of the Board. The contract is wholly silent with regard to whether Board approval must be obtained before or after rates are raised. The issue is illusory, and nothing turns upon it.
A similar situation exists with regard to the budget issue. Gulf Coast charges that UHS-Qualicare unilaterally revised the 1983 budget. Yet the only reasonable construction of the Management Agreement vests authority in Gulf Coast to "un-revise" the budget. Gulf Coast could have taken this corrective action  easily (legally, that is) and immediately.
Assigning legally correct meaning to the words employed in the Management Agreement, we declare that Gulf Coast through its duly constituted governing board has both final and immediate authority with respect to rates and fee structure. Conversely, UHS-Qualicare has no authority to impose and maintain in effect a rate structure Gulf Coast does not like. We are thus confronted with a rather novel situation. UHS-Qualicare has done something  raise the rates  which Gulf Coast by a simple resolution of its Board of Directors, if not by a letter from its president, has unequivocal authority to override  immediately.
Today's case is a tailor-made reminder that the primary function of our law of contracts is "to deter people from behaving opportunistically toward their contracting parties." Posner, Economic Analysis of Law 81 (3d Ed. 1986). Proceeding on the assumption that each party is a rationally self-interested wealth maximizer, our law allows parties such as these great freedom to strike their own deal. We imply into those contracts only such terms as may be expected to fill out the parties' agreement and reasonable expectations.
The novel situation we confront today is one about which the contract provides no express directive. Put abstractly, the question is this: where one party to a contract acts with respect to a matter where the other has unqualified authority, has the acting party breached materially? Assuming arguendo that the acting party has breached the contract, is the other party allowed the radical remedy of termination where it has complete power of cure, where it could by its own action supersede the offending act of the other? The question suggests its own answer: No, absent express contractual language to the contrary.
In a technical sense UHS-Qualicare breached the contract; that is, UHS-Qualicare did something it wasn't authorized to do. It revised the budget and raised the rates. The contract vests final authority regarding these matters in Gulf Coast and Gulf Coast alone. Our question is whether that breach was the sort of breach of contract which justifies the radical remedy of termination. Here again we consult the language of the contract and find it written that
If manager shall fail to keep, observe or perform any material covenant, agreement, term or provision of this agreement to be kept, observed or performed by a manager, and such default shall continue for a period of thirty (30) days after written notice thereof by corporation to manager, then in case of any such event and upon the expiration of the aforesaid thirty (30) day period, this agreement shall terminate at any time thereafter upon notice to manager by the corporation in writing.
Management Agreement, Art. VIII(C).
Note the placement of the word "material" in the above language. The word "material" appears as a limitation on "covenant, agreement, term or provision... ." No such word appears prior to the words "fail to keep, observe or perform....", i.e. breach. We think it established law, nevertheless, that a clause such as this should have implied into it the concept of material *756 breach.[7] The fact that the termination clause is limited to "material" covenant, agreement, etc. in no way answers whether the breaches must also be material.
Absent clear language to the contrary, we regard it wholly unreasonable that the language of a twenty year, multimillion dollar contract, be read to provide that any failure (whether material or not) to keep, observe or perform, etc. will suffice to trigger the termination clause. Such a result would be productive of great economic waste. An implied requirement that breaches justifying termination be material is only fair, while the contrary reading could only produce harsh, unreasonable, expensive and unintended consequences. The concept of material breach is sufficiently familiar and well-known that contracting parties and their drafting attorneys are charged with knowledge of it. If they wish to exclude it from their contract, they must do so clearly.
In sum, we regard the best legal reading of the language of the contract to be
If manager shall ... [breach materially] any material covenant, agreement, term or provision of this agreement... .
We note that this was the construction the Circuit Court placed upon the clause the two times it referred to breach. In that Court's opinion we find, first, the phrase "a material breach of contract" and, second, the phrase "substantial and material breaches." The Circuit Court correctly implied the concept of materiality into the breach and termination article in the management contract.
Moreover, in its termination efforts Gulf Coast was obviously thinking in terms of material breaches. In its July 12, 1983, letter, Gulf coast states "We regard each of the foregoing as material breaches... ." The August 15, 1983, letter twice refers to "material breaches." Nothing in the record suggests that, until time came for its lawyers to write their brief, Gulf Coast ever considered that it had authority to invoke the termination clause in the event of breaches not "material."
The termination of a contract is an "extreme" remedy that should be "sparsely granted." See, e.g., Lipsky v. Commonwealth United Corp., 551 F.2d 887, 895 (2d Cir.1976); 17A C.J.S. Contracts § 422(1), at 517-18 (1963). Termination is permitted only for a material breach. A breach is material when there "is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose," Gulf South Capital Corp. v. Brown, 183 So.2d 802, 805 (Miss. 1966), or when "the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract," Matheney v. McClain, 248 Miss. 842, 849, 161 So.2d 516, 520 (1964).
Materiality is ordinarily a question of fact, e.g., Hensley v. E.R. Carpenter Co., 633 F.2d 1106, 1110 (5th Cir.1980), albeit one of ultimate fact, not evidentiary fact. The standard for determining materiality must necessarily be both "imprecise and flexible" to "further the purpose of securing for each party his expectation of an exchange of performances." Restatement (Second) of Contracts § 241 comment a (1981).
The key to understanding why UHS-Qualicare's breach was not material lies in the total and absolute authority of Gulf Coast to undo that breach and its effect  and to do so immediately. The day it learned of the rate increase and budget changes, Gulf Coast had total authority to overrule those actions. Our general rule is that a party to a contract may not take advantage of its own act or omission. Dawson's Dependents v. Delta Western Exploration Co., 245 Miss. 335, 343, 147 So.2d 485, 487 (1962); Callon Petroleum Co. v. Big Chief Drilling Co., 548 F.2d *757 1174, 1178 (5th Cir.1977). If a party has the power to avoid damage, that party has no legal right to experience that damage and send the bill to the breaching party. Rather, that party may recover no damage that it could have avoided had it only acted reasonably. By the same token, Gulf Coast may not declare termination of the contract when it had available a far less drastic remedy  a simple resolution of its board of directors or even letter from its president telling UHS-Qualicare to undo that which it had done. All of this is a corollary of a breaching party's right to a reasonable opportunity to attempt cure. Cf. Fitzner Pontiac-Buick-Cadillac, Inc. v. Smith, 523 So.2d 324-328 (Miss. 1988).
Gulf Coast claims that it did not seize its authority and roll back the rates because of threats from UHS-Qualicare. This is incredible. Gulf Coast, which together with its puppeteer, Safecare, have been among the most brazen litigants this Court has seen, claims it was scared to overrule UHS-Qualicare on the rate and budget changes for fear that UHS-Qualicare would file a lawsuit. Horsefeathers. Timidity will not excuse a contracting party from doing that which in good faith and fair dealing it ought to have done.
Let us be clear about what we are saying. UHS-Qualicare's unilateral actions regarding the rates and budget were not material breaches because the Management Agreement gave Gulf Coast absolute and immediate authority to interdict and reverse those actions. If, however, Gulf Coast had given such instructions for reversal, and if UHS-Qualicare had persisted and continued to bill patients at the increased rates, we might then have a horse of a different color, although in that instance the breach may well have been of the covenant of good faith and fair dealing implied in law in all contracts in this state.[8] Today's horse, however, was completely subject to the reins and whip of its master who was obligated to at least try to exercise its authority before declaring termination.
Against this backdrop, the Circuit Court's error is unmasked. In its opinion the Circuit Court stated:
Here we have a substantial increase without consent of the hospital. The implementation of a new budget without Board approval was in aid of the rate increase. These two matters in the opinion of the Court are substantial and material breaches and have not been cured.
Implicit in these statements was that sole authority to cure was vested in UHS-Qualicare. As we have declared above, the legally correct reading of the Management Agreement vests primary, unqualified and immediate authority with respect to both matters in Gulf Coast. The Circuit Court erred as a matter of law in its reading of the contract. The result it reached, a decision declaring the contract terminated, followed from that error of law.
Noteworthy, moreover, is the Circuit Court's finding that the "breaches" ... "have not been cured." More precisely, the record reflects that the new rates UHS-Qualicare put into effect are still in effect, or, at least, they were as of the date of trial. Considering that Gulf Coast had absolute authority to roll back the rates, the fact that those rates are still in effect speaks volumes for how material UHS-Qualicare's "breach" really was and, as well, regarding Gulf Coast's and Safecare's true intention regarding this entire matter.[9]
*758 In the end we hold that this is a case within the scope and contemplation of our declaratory judgment procedure. Rule 57, Miss.R.Civ.P. We declare the Management Agreement here at issue to be in full force and effect according to its terms. The parties shall hereafter accord it a reading not inconsistent with this opinion.

VI.
UHS-Qualicare has cross-appealed the dismissal of its counterclaim against Gulf Coast, Safecare, S.C. Longview, Inc., J. Stephen Wright, Stephen R. Jepson, and Larry W. Wells.[10] The Circuit Court said little or nothing about the counterclaim. The only thing that is clear is that the Circuit Court thought dismissal of the counterclaim necessarily followed its disposition of Gulf Coast's principal claim for declaratory judgment. By reason of our action on this principal claim, we hold that the judgment dismissing the counterclaim must be reversed and the claims encompassed therein must be remanded for such further proceedings as may be appropriate, not inconsistent with this opinion.
ON DIRECT APPEAL, REVERSED AND RENDERED; ON CROSS-APPEAL, REVERSED AND REMANDED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
GRIFFIN, J., not participating.
NOTES
[1] Because of its importance, the June 16, 1983, letter is set forth here in full.

 SAFECARE COMPANY, INC. TELEPHONE (206) 223-4560
 SUITE EIGHT HUNDRED REPLY TO 900 FOURTH AVENUE
 900 FOURTH AVENUE P.O. BOX 21485
 SEATTLE, WASHINGTON 98164 SEATTLE, WA 98111
 VIA: FEDERAL EXPRESS
 June 16, 1983
 Mr. Alan B. Miller
 President & Chairman of the Board
 Universal Health Services, Inc.
 367 South Gulph Road
 King of Prussia, PA 19406
 Dear Alan:
 It has come to our attention as a result of routine
 conversation with the New Orleans home office staff, that on
 June 1 of this year certain increases in patient charges were
 implemented at Gulf Coast Community Hospital without the prior
 consent of Safecare Company. I am also aware that revised
 budgets have been prepared and adopted at both Gulf Coast
 Community Hospital and Lander Valley Regional Medical Center
 without our knowledge or consent.
 As 50% owners of these facilities, Safecare has in the past
 been consulted in the rate setting process, and should in the
 future be consulted, and its approval sought, with respect to
 all rate changes. It is our firm position that unilateral
 increases in patient charges at any of our hospitals are
 unacceptable, and will not be tolerated without our prior
 review and consent.
 In an effort to learn some specific facts regarding these
 changes, I made a number of inquiries to the hospital
 administration, and it is apparent that they are reluctant to
 discuss specific details and have been instructed not to
 communicate this kind of information to us. If this is factual,
 it represents a serious departure from longstanding practices
 as well as a violation of our right to information.
 Therefore, Safecare hereby demands to be properly informed
 and our approval sought prior to implementation of any patient
 rate changes in order that we might properly evaluate the
 propriety and effect upon Safecare Company, Inc., and SAFECO
 Corporation.
 Sincerely,
 SAFECARE COMPANY, INC
 /s/
 Stephen R. Jepson
 Vice President
 SRJ/brl
 cc: L.W. Wells
 J. Stephen Wright

[2] The legality of these corporate maneuverings is not before us and nothing said here should be taken as an expression of an opinion regarding same. We do note, nevertheless, that they are not challenged by UHS-Qualicare.
[3] The termination letter of July 12, 1983, is reproduced in full:

 GULF COAST COMMUNITY HOSPITAL, INC.
 8th Floor, 900 Fourth Avenue
 Seattle, Washington 98164
 CERTIFIED MAIL  RETURN RECEIPT REQUESTED
 July 12, 1983
 Qualicare of Louisiana, Inc.
 U.H.S. Qualicare, Inc.
 Universal Health Services, Inc.
 Attention: Mr. Allan B. Miller
 President
 938 LaFayette Street
 New Orleans, LA XXXXX-XXXX
 367 South Gulph Road
 King of Prussia, PA 19406
 Re: Management Contract
 Gentlemen:
 This is in connection with the Management Contract dated
 March 1, 1980 (the "Management Agreement") between undersigned
 (formally known as Gulf Coast Community Hospital) and Qualicare
 of Louisiana, Inc., a Louisiana Corporation ("Qualicare")
 relating to the Gulf Coast Community Hospital (the "Hospital").
 We understand that (i) the interest of Qualicare in the
 Management Contract has been assigned, by way of merger, to
 U.H.S. Qualicare, Inc., a Delaware corporation, or to Universal
 Health Services, Inc., a Delaware corporation (individually and
 collectively "Universal") without the consent of the
 undersigned corporation required by the Management Contract and
 (ii) Universal, as Qualicare's successor, has made changes in
 the operation of the Hospital which are materially detrimental
 to the safe and/or efficient operation of the Hospital
 including, without limitation, certain changes in the fee
 structure of the Hospital without the consent of the
 undersigned corporation required by the Management Contract.
 Changes to the fee structure not only endanger the economic
 viability of the Hospital but equally important prevent it from
 carrying out its public service duties as a health care
 provider at the lowest possible cost and within the guidelines
 established by the Board of Directors of the undersigned
 corporation. We regard each of the foregoing as material
 breaches to the Management Contract.
 The undersigned does not perceive any means by which the
 foregoing defaults may be cured. Accordingly, notice is hereby
 given that effective immediately the undersigned corporation
 hereby terminates the Management Contract.
 Please contact undersigned immediately so that we may arrange
 a safe and orderly transition.
 The recitation herein of the foregoing breaches of the
 Management Contract does not waive or release the undersigned's
 right to claim additional breaches.
 Very truly yours,
 GULF COAST COMMUNITY HOSPITAL, INC.
 a Mississippi Corporation
 by: _______________________________
 J. Stephen Wright
 Chairman of the Board
 and President

[4] The record reflects that Safecare and UHS and/or UHS-Qualicare had joint interests in several hospitals other than Gulf Coast. The controversy between Safecare and UHS and/or UHS-Qualicare involved control and operation of these other hospitals as well. Aside from this note, nothing will be said here regarding these other hospitals, for they are not involved in the present controversy of whether there was a breach of the March 1, 1980, Management Contract with respect to Gulf Coast Community Hospital.
[5] The August 15, 1983, termination letter appears in full as follows:

 GULF COAST COMMUNITY HOSPITAL, INC.
 900 Fourth Avenue, Suite 800
 Seattle, Washington 98164
 CERTIFIED MAIL  RETURN RECEIPT REQUESTED
 August 15, 1983
 Qualicare of Louisiana, Inc.
 U.H.S. Qualicare, Inc.
 Universal Health Services, Inc.
 Attention: Mr. Allan B. Miller
 President
 938 Lafayette Street
 New Orleans, LA XXXXX-XXXX
 367 South Gulph Road
 King of Prussia, PA 19406
 RE: Management Contract
 Gentlemen:
 This is in connection with the Management Contract dated
 March 1, 1980 (the "Management Agreement") between the
 undersigned (formally known as Gulf Coast Community Hospital)
 and Qualicare of Louisiana, Inc., a Louisiana corporation
 ("Qualicare") relating to the Gulf Coast Community Hospital
 (the "Hospital").
 By letter of July 12, 1983, we notified you that the
 Management Agreement had not been validly assigned by Qualicare
 and, further, that you have made changes in the operation of
 the Hospital that are materially detrimental to the safe and/or
 efficient operation of the Hospital, which changes constitute
 material breaches of the Management Agreement. The letter of
 July 12, 1983, discussed specifically (but without limitation)
 changes in the fee structure of the Hospital. Additional
 changes in the operation of the Hospital (as you are aware)
 include the following:
 1. You have adopted and implemented new operating budgets
 without proper authorization.
 2. You have imposed restrictions on capital expenditures and
 required that Universal Health Services, Inc., approve capital
 expenditures, all without proper authorization.
 3. You have implemented a new accounting system at an
 unjustified cost substantially greater than the cost of the
 previous system.
 4. You have improperly prepared two separate sets of
 financial statements, to the prejudice of the stockholders of
 the Hospital, and without fully disclosing the contents of
 those two sets of financial statements.
 5. You have made prior period accounting adjustments to the
 Hospital's accounting records materially altering the method of
 calculating retained earnings. The effect of such adjustments
 is a substantial reduction or elimination of already previously
 reported earnings.
 6. You have altered the method of calculating management fees
 paid pursuant to the Management Agreement.
 Without waiving any right to obtain a declaration that the
 Management Agreement is void for lack of a valid assignment,
 you are again notified that each of the above changes in the
 operation of the Hospital constitutes a material breach of the
 Management Agreement resulting in termination of the Management
 Agreement.
 Very truly yours,
 GULF COAST COMMUNITY HOSPITAL, INC.
 a Mississippi Corporation
 /s/ 
 Stephen R. Jepson
 Vice President

[6] UHS-Qualicare argues that in practice the Gulf Coast Board had theretofore exercised prior approval over rate increases only where the increases could be classified as "major." Implicit in the point is that a per patient rate increase from $654 per day to $738 per day is only a "minor increase," although for obvious reasons UHS-Qualicare never states the point so baldly. Lest one think this argument by UHS-Qualicare absurd and thus impeaching of the integrity and quality of its other arguments, we must note that it is matched by Safecare/Gulf Coast's argument that the $654 per patient day rate is "moderate."
[7] Gulf Coast argues that Olin Corp. v. Central Industries, 576 F.2d 642, 646-48 (5th Cir.1978) provides otherwise. To the extent that Gulf Coast may be correct, Olin represents a misreading of Mississippi law.
[8] Every contract contains an implied convenant of good faith and fair dealing. See, e.g., Ohashi v. Verit Industries, 536 F.2d 849, 853 (9th Cir.1976); Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala. 1981); Corwin Chrysler-Plymouth v. Westchester Fire, 279 N.W.2d 638 (N.D. 1979); Christian v. American Home Assurance Co., 577 P.2d 899, 904 (Okla. 1977); see also Restatement (Second) of Contracts § 205 (1979) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); and Posner, Economic Analysis of Law 81 (3d Ed. 1986); cf. Miss. Code Ann. § 75-1-203 (1972) (imposing general duty of good faith); but see Griffin v. Ware, 457 So.2d 936, 940 (Miss. 1984).
[9] In the August 15, 1983, letter, see footnote 3 supra, Gulf Coast charged several additional breaches of contract. In its brief it argues those breaches. The Circuit Court, however, passed only upon the charges that UHS-Qualicare increased the rates and revised the budget. Quite apparently the rate and budget issues were the heart of Gulf Coast's grounds for termination. Moreover, Gulf Coast never identifies the duties imposed upon UHS-Qualicare violation of which may fairly be labeled "additional breaches." We proceed as did the Circuit Court only with reference to those two charges of breach  rates and budget. Suffice it to say that Gulf Coast had authority to cure the additional alleged breaches had it wished to do so.
[10] UHS-Qualicare's claim against Gulf Coast is correctly denominated a counterclaim. Rule 13(a), Miss.R.Civ.P. None of the other so-called counter-defendants  Safecare, S.C. Longview, Wright, Jepson and Wells  were original plaintiffs. UHS-Qualicare's claims against them are third party claims. Rule 14, Miss.R.Civ.P.