Michael A. HADEN, Plaintiff/Counter-Defendant,

v.

KRUPP ASSET MANAGEMENT CORPORATION, Defendant/Counter-Claimant.

Civ. A. No. J89–0509(W).

United States District Court,
S.D. Mississippi,
Jackson Division.

Oct. 24, 1990.

James W. Nobles, Jr., Jackson, Miss., for plaintiff/counter-defendant.

Mark D. Herbert, Gram G. Meadors, Ott & Purdy, Jackson, Miss., for defendant/counter-claimant.

## MEMORANDUM OPINION
## AND ORDER

WINGATE, District Judge.

This case was tried before the court sitting without a jury on August 27, 28, and October 3, 1990. Parties of the dispute are the plaintiff, Michael Haden, who is an adult resident citizen of Hinds County, Mississippi, and the defendant, Krupp Asset Management Corporation, a corporation domiciled in the State of Massachusetts. This court has diversity jurisdiction to hear this cause pursuant to 28 U.S.C. § 1332.[1] The dispute between these parties centers around a construction contract, where the plaintiff was to rehabilitate the exterior of defendant's buildings within an apartment complex. The plaintiff claims defendant breached the contract and is suing for damages, while defendant, who has entered a counterclaim, in turn, claims plaintiff is the party who has breached the contract. Now, pursuant to Rule 52, Federal Rules of Civil Procedure, the court sets out below the reasons which persuade the court to find for the defendant.

## I. FACTS AND CHRONOLOGY
## OF THE CASE

This case originated from the desire of Krupp Asset Management Corporation (hereinafter referred to as "Krupp" or "Krupp/Countryside") to rehabilitate buildings in its apartment complex, Countryside Apartments, located in Ridgeland, Mississippi. Krupp made it known that it would accept bids for the rehabilitation of buildings within the complex. Haden is a con-

---

**1.** Section 1332, 28 U.S.C., provides: (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—

    (1) citizens of different States; ...

struction contractor. He placed a bid and was chosen by Krupp as the contractor for the project. The parties entered into contract on February 26, 1988. This agreement provided that the exterior siding, trim, and paint on the buildings would be redone. Originally the total value of the contract price was $247,800.00. However, Haden's bid for accomplishment of work and total cost of labor and materials reduced and revised the contract price to $226,800.00 by an agreement of both parties on February 22, 1988. But when the subsequent change orders were approved, the total contract became $274,845.00.

Krupp/Countryside issued Haden a notice to proceed with the work on March 8, 1988. Completion date for the entire construction project was July 18, 1988. The buildings were to be repaired in the following order: buildings # 2, 3, 4, main office, 11, 12, 5, 6, 7, 8, 9, and 10. Initially, the project called for the contractor to complete one building before moving on to rehabilitate the next. Haden worked out an arrangement with Johnny Yates, the Division Engineer and Representative for the Krupp Realty Company, which altered this arrangement. Under the new understanding, crews were assigned to do certain tasks in each building, rather than repair an entire building at one time. Eventually, with the succession of each work crew, the building would become completely rehabilitated.

Krupp/Countryside arranged to pay Haden in six anticipated draw payments. Krupp made the initial payment of $24,500.00 to Jackson Wholesale Building Supply Company (hereinafter referred to as "Jackson Wholesale") as a prepayment of materials. All subsequent payments were jointly paid to Haden and Jackson Wholesale. The amount of money for each draw was made upon submission of an estimate for payment application. The estimates could be submitted before work on each building was finished.

Haden began the work upon issuance of the notice to proceed, March 18, 1988. Krupp paid Haden a total of $226,472.00 based upon the five estimates submitted for payment, withholding $25,163.00 in retainage as called for by the contract. (Article 4.3 allowed a retainage for ten percent (10%) of the value of the work.) After receiving payment for estimate No. 5 in what Haden considered a delayed manner, he contacted an attorney. The attorney sent a letter dated August 3, 1988, which gave formal notice that Haden would cease labor on the project because Krupp/Countryside was in breach of contract, pursuant to Article 20.1,[2] due to delays in properly processing the draw payments. On August 8, 1988, Haden removed his crews from the Countryside Apartments worksite. Haden directed Jackson Wholesale to pick up all the unused materials left from the project and credit Krupp's account for what was returned.

At the time, Haden walked off the project site, the unpaid balance on the Countryside/Haden contract was $48,373.00, including the $25,163.00 held as retainage. On September 20, 1988, Krupp/Countryside gave Haden written notice that under Article 20.2[3] of their

---

**2.** Article 20.1 reads: "If the Owner's Representative (Johnny Yates) fails to issue a certificate for payment for a period of thirty (30) days through no fault of the Contractor (Michael Haden), or if the Owner (Krupp/Countryside) fails to make payment thereon for a period of thirty days, the Contractor may upon thirty additional days notice to the Owner and the Owner's Representative, terminate the Contract and recover from the Owner payment for all work executed and for any proven loss sustained upon any materials, equipment, tools, and construction equipment and machinery which is lawfully due the contractor and is not subject of a dispute between the Contractor and Owner or Contractor and Subcontractor or both."

**3.** Article 20.2 reads: "If the Contractor defaults or persistently fails or neglects to carry out the work in accordance with the Contract Documents or fails to perform any provision of the Contract, the Owner, after seven days written notice to the Contractor and without prejudice to any other remedy he may have, may make good such deficiencies and may deduct the cost thereof including compensation for the Architect's additional services made necessary thereby, from the payment then or thereafter due the Contractor or, at his option. If such default has not fully and completely remedied to the Owner's satisfaction, by additional written notice to the Contractor, may terminate the Contract and take possession of the site and all the materials,

contract if Haden did not return to the construction site within seven (7) days, then that writing would constitute a notice to stop work and that Krupp would take necessary steps to protect its interest. When Haden did not return to the site ten days later, Krupp/Countryside sent a letter dated September 30 which gave final notice that the contract was terminated in accordance with Article 20.2.

Krupp obtained another contractor to complete the work required under the February 26, 1988, contract. Construction Corporation of America (hereinafter referred to as "CCA") was awarded the bid to complete the project and to remedy any previous work performed by Haden that was done in a defective manner. A contract between Krupp and CCA for the completion of the apartment complex was entered into on October 6, 1988. CCA received $88,293.20 in total and completed the Countryside project on January 13, 1989. An additional cost of $46,436.96 was necessary to purchase materials used by CCA.

## II. CLAIMS OF THE PARTIES

### Plaintiff's Version

Plaintiff contends that the breach by Krupp/Countryside justifies his abandonment of the project, and that he is due the remaining money under the contract for the work performed. Haden maintains that he substantially completed the work at the Countryside apartment complex. He argues that Krupp is precluded from claiming any type of recovery from Haden since, says Haden, Krupp accepted the work. In addition, plaintiff asserts that any claims made by the defendant against him are unsupported by the evidence.

Haden claims that noncompliance with the payment schedule was the main reason why he left the Countryside project. From his understanding of the contract, payment was to be received within thirty (30) days from the date of estimate request. The plaintiff says that payments # 3, 4, and 5 were late. Plaintiff contends that Krupp

was having financial difficulties and as a result consistently delayed issuance of payments. Haden says the time period covered by estimate no. 3 began on April 1 and ended on April 30, 1988. Haden submitted the application for payment on April 5, and a sum of $65,250.00 was received on May 6, 1988. According to Haden, the money for estimate no. 3 was six days late. Estimate no. 4 covered the period from May 1 to May 31, 1988. The request for $58,163.00 was submitted on April 29. Haden says that the funds from estimate no. 4 were received on June 15, 1988, about two weeks late. The latest received payment was from estimate no. 5 which was submitted on June 27, for the period covering June 1 to June 30, 1988. Haden contends that estimate no. 5 was finally approved and paid approximately one month after the application had been submitted. The estimate amount of $70,459.00 was paid out by the authorization of Johnny Yates on July 26, 1988. Haden claims that payment was inexcusably held up by the defendant. During the time that estimate no. 5 was withheld, Haden gave notice to Krupp of the alleged breach of contract. On or about August 8, 1988, the plaintiff took his work crews off the Countryside premises based on that breach.

When plaintiff left the project site, he contends that the major portion of work had been performed by him. During trial Haden testified that the state of completion on buildings # 2, 3, 4, 5, 6, 11, 12, and the main office were substantially complete. Buildings # 8 and 9 were still under construction. And building # 10 had some work remaining to be done before it could be substantially complete. Plaintiff seeks the retainage amount of $25,163.00 held by Krupp, plus an award of $15,000 for expenses he incurred when payment delays caused a loss of some workers, so he had to hire and train others to replace them. This inconvenience caused him to waste time and duplicate work. He wishes the court to find that Krupp has not been damaged as a result of his leaving the project site. Therefore, the defendant is not entitled to

---

equipment, tools, and construction equipment and machinery thereon owned by the Contrac-

tor and may finish the work by whatever method he may·deem expedient ...."

anything from him by way of its counterclaim. Haden asserts that the defendant is also responsible for the attorneys' fees that he has incurred as a result of this suit.

### Defendant's Version

The defendant, Krupp, responds that since its payments were made on a timely basis, the plaintiff abandoned the project without just cause. Further, says the defendant, at the time of plaintiff's departure, there was not substantial completion of the specified work under the terms of the Countryside/Haden contract. And, continues the defendant, since adequate notice was not given concerning the abandonment pursuant to Article 10 [4] which dealt with the Warranty of Workmanship, plaintiff breached his contractual obligation. As a consequence of this alleged breach, defendant claims that it had to bear the costs of another construction contractor to complete the project. Furthermore, Krupp alleges that the Countryside work site suffered water damage when it was left incomplete and exposed to inclement weather conditions due to Haden's sudden departure.

### III. OVERVIEW OF THE LAW

■ Pursuant to *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the applicable law for this contractual dispute is taken from the forum in which the federal court sits, the law of the State of Mississippi. *Rittenhouse v. Mabry*, 832 F.2d 1380, 1382 (5th Cir.1987); *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1264 (5th Cir.1983) (both these cases say that in a federal diversity case, the federal court must apply the law of the state in which it sits). Under such law, when one enters into a contract, absent fraud or other illegal purpose, the party binds himself to perform accordingly. *Chevron Oil Co. v. Clark*, 291 F.Supp. 552

(D.C.Miss.1968) (Parties to a contract are obligated to perform in accordance with their terms); *see also Brown v. Battle*, 220 Miss. 530, 71 So.2d 790, 791 (1954) (A party committed himself under contract to perform in a manner that the State Supreme Court had ruled could not be required, however, since party guaranteed performance, the Court found that he was bound to carry out the contract under its specified terms). In the case of *UHS–Qualicare, Inc. v. Gulf Coast Community Hospital, Inc.*, 525 So.2d 746, 756 (Miss.1987), the Court found that the failure of one party to perform a substantial part of contract was a material breach which allowed the other party to terminate the contract. And, in *Brent v. Corbin*, 252 Miss. 464, 173 So.2d 430 (1965), the Court held that the party that is in default cannot maintain a suit for breach of contract against the other. Common sense dictates that damages should be assessed against the party that breaches the contract. *See e.g., Eastland v. Gregory*, 530 So.2d 172 (Miss.1988) (Party who breaches contract is only liable for damages caused by the breach, nondefaulting party is only entitled to be put in the same position had there been no breach). The calculation of such damage is the amount which reasonably flows from the breach: *Vickers v. First Mississippi Nat. Bank*, 458 So.2d 1055, 1062 (Miss.1984) (The State Supreme Court recognized that there is a right to recovery for foreseeable damages flowing from a breach of contractually imposed duties); *Wright v. Stevens*, 445 So.2d 791 (Miss.1984) (Owners were entitled to recover from the contractor all sums reasonably expended and necessary to complete construction of swimming pool they had originally bargained for). More specifically, in a contract action, a claimant may recover "consequential damages reasonably foreseeable at the time the contract was made and established at trial, where properly pled and supported by substantial evi-

---

**4.** Section 10.4 of the relevant Article reads: "The Contractor warrants to the Owner and the Owner's Representative that all materials and equipment incorporated in the work will be new and of first quality unless otherwise specified in writing to the Owner's Representative in ad-

vance of use, and that all work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All work not conforming to these requirements shall be considered defective."

dence." *Aetna Cas. & Sur. Co. v. Day*, 487 So.2d 830, 835 (Miss.1986).

## IV. ANALYSIS

■ The court finds that plaintiff breached the contract by abandoning the work site without just cause. After careful review of the contract itself and the in-court testimony, this court is convinced that the correct time from which to begin the thirty-day count runs from the *end of the month* in which the work was performed. This is contrary to the plaintiff's belief that the counting period starts from the date that the estimate received Yates' approval. In Article 4.1 of the contract, under the section entitled "Progress Payments", it reads: Based upon Applications for payment submitted to the Owner's Representative by the Contractor and Certificates for Payments issued by the Owner's Representative, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided in the Contract Documents for completed work only for the period ending the last day of the month as set forth in the Contract Documents." In light of this section, the fact that the estimates were submitted and approved early did not accelerate the time in which payments could be considered late. Therefore, as shown by Yates' testimony at trial, payment # 3, which was due on May 30 and was received by Haden on May 6, was twenty-four (24) days early. Payment # 4 which was due on June 30 and was paid on June 15 was fifteen (15) days early. And payment # 5, which was due on July 30 and received by Haden through wire transfer on July 26 was four (4) days early. From the foregoing analysis, it is obvious that Krupp made timely payment for all estimate applications submitted by Haden.

In addition to his reading of the contract, Haden also relies upon an "admission" by the defendant that the payments were tardy. Haden points to a memo prepared by Johnny Yates in which Yates referred to some payments as having been late. However, Yates testified that when he prepared the memo he did so from memory, without access to the contract itself, in an hurried effort to acquaint another Krupp employee with the background of the work project. Yates further stated that by "late," he was referring to the time he himself wished to have the payments in his hands so that he could schedule personal trips to the work sites. The court accepts this testimony.

■ The court also finds that plaintiff breached the Countryside/Haden agreement by not substantially completing the work he was hired for under the contract. Yates surveyed the project site after Haden had pulled his crews from the job. After walking through the area, Yates found that work was approximately 50–60% complete. Yates, the Krupp Division Engineer, said that in the construction business, the contracted work was considered substantially complete when 90% was done and only minor repair work was needed to finish the job. This understanding is closely aligned with Mississippi law definition of "substantial performance" as the performance of all important particulars of a building contract without "literal, full, or exact performance in every unimportant detail." *Jackson v. Caffey*, 223 Miss. 368, 78 So.2d 361, 362 (1955); *Standard Millwork & Supply Co. v. Mississippi Steel & Iron Co.*, 205 Miss. 96, 38 So.2d 448, 450 (1949). *See additionally, Bevis Constr. Co. v. Kittrell*, 243 Miss. 549, 139 So.2d 375, 379 (1962). If the structure is whole and not impaired for its intended purpose, and the defects can be corrected without great expenditure or material damage to other parts of structure, the work is deemed substantially complete. *Id.* In addition to adequate completion of work, the doctrine of substantial performance requires the breaching party act in good faith, displaying no willful omission. *Board of Trustees of State Inst. of Higher Learning v. Johnson*, 507 So.2d 887, 888 (Miss.1987). This court finds that Haden's leaving the work site without giving the contractually-required notice of abandonment to Krupp was not an act of good faith and certainly was in violation of the express terms of the

contract, namely Article 20.1.[5]  *See Oden Constr. Co. v. Helton,* 218 Miss. 41, 65 So.2d 442, 445 (1953).

■ Finally, the court is unimpressed with Haden's argument that Krupp is estopped to claim a breach on work accepted by Krupp as evidenced by Krupp's payments of five installments. The evidence fails to support this assertion. The contract between the parties contemplated full performance, while allowing plaintiff periodic pay installments to address plaintiff's needed financing. Further, the parties' agreement of how plaintiff's crews were to proceed towards completion of the contract thoroughly undermines plaintiff's argument. As earlier mentioned in this opinion,[6] the parties agreed to a work procedure where specialized work crews would concentrate on a specified matter in a building, then move on to complete the same task in another building, to be followed by other crews which would address other repair work. When all work was completed, a final review was then to be conducted.

## V.  DAMAGES

■ The defendant contends that completion of the project was a costly venture. Krupp representative Yates noted that roof, chimney, and eaves flashing, siding, and paint trim work remained incomplete or undone for buildings # 5–10. There was additional testimony from Steve Allgood, president of CCA, that throughout the construction site open chimney caps, unreplaced or incorrectly applied siding, and missing gutters made the buildings susceptible to water damage. Yates testified that the materials stacked in buildings # 1–4 were open to vandalism. Building # 5 was untrimmed, unpainted, and no fence nor gutter work had been done. The same conditions existed for buildings # 6 and 7, plus the siding had been attached to the walls by using an air gun to drive in the T-nails. Crozier, the Krupp project manager, explained that the use of T-nails was not approved because their application allowed for water to seep inside the siding and the small head of the T-nail allowed the siding to buckle. This method of applying the siding was in violation of the Countryside/Haden contractual provisions for the repair work. Just preliminary work had been done on buildings # 8–10, such as old siding taken off and minor chimney work. Buildings # 11 and 12 were nearly substantially complete because only firewall and gutter work remained to be done. However, the court finds that even if half the buildings were substantially complete, this is insufficient work to characterize the whole project as substantially complete. According to Allgood, because Haden had not used the correct techniques for the residing and the chimney cap installation work, parts of some buildings had to be torn away and redone by CCA before the finishing touches could be made. CCA replaced T-nail siding where water had run down, rebuilt roof work which had no overhang, replaced all chimney caps, and repainted trim boards. Allgood further testified that substantial portions of the completion costs involved correcting defective work.

The defendant's countersuit against Haden comes to a money judgment of $102,284.58. The break down of this figure is composed of the CCA contract fee ($88,293.20); the cost of the additional material CCA had to obtain ($46,436.96); the outstanding balance for the Jackson Wholesale materials ($5,927.42), which were used by CCA in completing the repairs; and the water damage sustained by buildings due to Haden's abandonment ($10,000.00), minus Haden's retainage ($25,163.00) and the rest of the unpaid balance due under the Countryside/Haden contract ($23,210.00). Both Yates and Crozier testified that for an entire month the abandoned work site was exposed to the occurrence of rainy weather. The extent of the water damage to buildings is gathered from Crozier's testimony that buildings # 2–4 had evidence of some water leakage. Photographs submitted in evidence before the court showed extensive water damage in buildings # 5–7. Allgood testified that from buildings # 3–

---

5.  *See, supra,* footnote 2.

6.  *See, supra,* page 1153.

**1158**

12, there was siding attached with T-nails that stuck out and allowed the water to run behind the boards onto the masonry. Hence, satisfied that Krupp's request for these damages is substantiated by the evidence, the court will grant the request.

Therefore, the court finds that the defendant Krupp Asset Management Corporation and its principal, Countryside Associates Ltd. Partnership, are entitled on their counterclaim to a judgment against the plaintiff, Michael A. Haden, in the total sum of $102,284.58, plus costs of court. Plaintiff's complaint against the defendant is hereby dismissed, and plaintiff is to take nothing thereon. A separate judgment shall be entered in accordance with the local rules.

SO ORDERED AND ADJUDGED.