LEE, J.,
for the court.
PROCEDURAL HISTORY
¶ 1. James and Ruth Doster were married in June 1999, separated in April 2000 and granted a divorce based on irreconcil *149 able differences in May 2001. With the order of divorce the Itawamba County chancellor denied James’s request to nullify the prenuptial agreement concerning the marital home and ordered that the marital home be sold and proceeds distributed as directed. He also directed that insurance monies from personal property which was stolen be divided one-half to each party, and declined to award attorney’s fees to either party. James appeals arguing that the chancellor erred in enforcing certain parts of the prenuptial agreement and that the court erred in failing to find Ruth hable for the loss of certain furniture. We review these issues and find no error; thus, we affirm.
FACTS
¶ 2. James Foster was sixty-seven at the time he married Ruth Carnathan, then fifty-two years old. Both James and Ruth had previously been married and had grown children as well as individual assets. Prior to the marriage James and Ruth signed a prenuptial agreement, which is described further in this opinion. The Fosters’s marriage ended shortly after it began, with James and Ruth both alleging the other mentally and physically harassed each other.
DISCUSSION OF THE ISSUES
I. DID THE COURT ERR IN ENFORCING THE PRENUPTIAL AGREEMENT?
¶ 3. James argues that the court erred in its interpretation and enforcement of the prenuptial agreement in various respects. “This Court’s scope of review in domestic relations matters is limited. We will not disturb the findings of a Chancellor unless the Chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” Wells v. Wells, 800 So.2d 1239(¶4) (Miss.Ct.App.2001).

a. $25,000 equity

¶ 4. James first objects to the chancellor’s enforcement of the specific provision in the prenuptial agreement which provides Ruth would receive the first $25,000 equity in the home. That specific provision read:
The parties hereto acknowledge that they are purchasing a home in Fulton, Mississippi, commonly known and described as 201 Timbers Drive, Fulton, Mississippi. JAMES L. FOSTER is contributing the sum of SIXTY-TWO THOUSAND FIVE HUNDRED DOLLARS ($62,500) as a down payment on this property and it is anticipated that IVA RUTH CARNATHAN will be making the monthly payments on said home out of her income. The parties will be acquiring said residence as tenants in common and not as tenants by the entirety. As part of the consideration of the Agreement, in the event of the divorce, dissolution of marriage, legal separation or death of either party, said home shall be sold and from the net proceeds of said sale, IVA RUTH CAR-NATHAN or her estate, shall first receive the $25,000.00 in equity and the parties or their estates will divide equally the balance of net proceeds of said sale after payment of any indebtedness, closing costs, attorney’s fees in connection with such sale, and the above referenced $25,000.00 to IVA RUTH CAR-NATHAN or her estate.
¶ 5. James claims he only agreed to the provision concerning the $25,000 because prior to the marriage he thought Ruth would lose her former husband’s railroad retirement as a result of her marrying him. Now, James claims that Ruth lied about losing her railroad retirement when, *150 in actuality, she was neither receiving such retirement nor would she lose it were she to divorce James; thus, James claims the section of the agreement concerning the $25,000 should be voided due to Ruth’s material misrepresentation, fraud or a mutual mistake. Ruth rebuts that the chancellor found as a matter of fact that Ruth made no such misrepresentation, resolving the issue of credibility in her favor. She additionally recounts James’s argument that “common sense” mandates there must have been some reason for the provision, namely Ruth’s receiving the railroad retirement; however, Ruth’s explanation is that James’s income was substantially more than her income, as were his assets, and $25,000 would be a mere drop in the bucket for James to relinquish to Ruth in the event of a divorce.
¶ 6. No evidence was produced to show why, at the time the document was drawn up, the $25,000 provision concerning sale of the marital home was included. James had his reason, Ruth had hers, and the chancellor was left to sort out the credibility of each in light of the evidence. Several proceedings were heard before the chancellor, and he was given ample opportunity to garner the parties’ intentions from each’s testimony and the evidence presented. The chancellor did not find James’s argument persuasive, and absent proof of clear error on the part of the chancellor, we decline to reverse.

b. Breach of prenuptial agreement

¶ 7. Concerning the previously quoted section from the prenuptial agreement, James also argues that regardless of the chancellor’s finding concerning the railroad retirement, Ruth failed to abide by the agreement in failing to make payments on the home; thus, the chancellor’s award of $25,000 to Ruth was unjust. In his opinion, the chancellor noted that Ruth lost her job due to downsizing, and Ruth testified that she could no longer afford monthly payments on the marital home, which James began making thereafter.
¶ 8. The chancellor found that Ruth made payments on the home for thirteen months, then lost her job, at which time James made payments the following eleven months. In his order, though, the chancellor ordered Ruth to reimburse James for these months in which James made payments totaling $8,600. James claims the chancellor’s compensatory actions are insufficient to override the fact that in Ruth’s ceasing to make payments, she breached the contract and, thus, the chancellor should have voided the provision. James maintains that the chancellor’s subsequent “altering” of the agreement to reimburse James, which was not provided for in the agreement, was unlawful.
¶ 9. “An antenuptial contract is as enforceable as any other contract. Accordingly, the same rules of interpretation apply.” McCord v. Spradling, 830 So.2d 1188(¶ 45) (Miss.2002) (citation omitted). We look to general contract law:
It is well established that when a person has been injured by a breach of contract, he is entitled to be justly compensated and is to be made whole by the trial court. However, it is never contemplated that the injured party be placed in a better position than he otherwise would have been in if the contract had been performed.
Polk v. Sexton, 613 So.2d 841, 844 (Miss.1993).
¶ 10. James cites no authority in support of his argument that the provision should have been voided due to Ruth’s failure to make payments on the home. Looking back to the language of this provision in the agreement, the wording is not definite to imply whether breach occurs if *151 Ruth fails to make the payments. The pertinent sentence reads, “JAMES L. DOSTER is contributing the sum of SIXTY-TWO THOUSAND FIVE HUNDRED DOLLARS ($62,500.00) as a down payment on this property and it is anticipated that IVA RUTH CARNATHAN will be making the monthly payments on said home out of her income.” In the contract, neither party provided any language as to what constituted a breach and what remedy would be available.
The termination of a contract is an “extreme” remedy that should be “sparsely granted”.... Termination is permitted only for a material breach. A breach is material when there “is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose,” or when “the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract....”
UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc., 525 So.2d 746, 756 (Miss.1987) (citations omitted). We find no material breach, and the chancellor’s remedy of restoring to James the monies he paid on the home when Ruth was unable to pay to be sufficiently without error; this point has no merit.

c. Other factors

¶ 11. James finally argues that the chancellor failed to consider other factors in awarding Ruth the $25,000 provided for in the contract. Namely, James argues the chancellor should have considered the factors provided in Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994), including Ruth’s failure to contribute to the equity in the home, Ruth’s alleged attempt to kill Jim during the pendency of the divorce, and Ruth’s alleged attempts to forge her name on the boat title and her perjury in court. The chancellor’s opinion gives no indication that he failed to consider all relevant facts and evidence in reaching his conclusion. Many proceedings were held before him, and through the record excerpts we find he was well-aware of both James’s and Ruth’s situations. We find our discussion in parts “a” and “b” of this issue sufficient to support our finding that this final argument is without merit.
II. DID THE COURT ERR IN FAILING TO FIND RUTH LIABLE FOR THE LOSS OF JAMES’S FURNITURE?
¶ 12. James finally argues that Ruth took $16,000 worth of his furniture without his permission, then hid it, and when the court asked that she return it, she claimed it was stolen. Ruth rebuts that several witnesses testified to corroborate her story, and the chancellor used his discretion to find Ruth more credible than James. James fails to cite authority on this issue, and we decline to address it further.
¶ 13. THE JUDGMENT OF THE ITAWAMBA COUNTY CHANCERY COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., THOMAS, IRVING, MYERS AND GRIFFIS, JJ., CONCUR. CHANDLER, J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY BRIDGES, J.