# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00289-COA

**PATRICK STUBBS AND QUACKPOT INVESTMENTS LLC**                    **APPELLANTS**

**v.**

**VIVIAN DIANE RAMSEY**                                           **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/05/2024 |
| TRIAL JUDGE: | HON. CHARLES E. SMITH |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | KATHRINE COLLINS CURREN |
| ATTORNEYS FOR APPELLEE: | ANTOINE JEROME LOCKHART |
| | GALE NELSON WALKER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/10/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND EMFINGER, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.    Patrick Stubbs and Quackpot Investments LLC appeal from the Lauderdale County Chancery Court's judgment granting Vivian Ramsey declaratory and injunctive relief concerning her rent-to-own contract to purchase a home that Quackpot acquired from Morgan Irby.  On appeal, Stubbs and Quackpot contend that the circuit court erred in enforcing the rent-to-own contract beyond its expiration date, that the court erred in failing to enforce a "time is of the essence" provision in a subsequent sales contract, and that the court failed to follow the law when exercising its equitable authority.  Having considered the

1

arguments of the parties and the relevant precedent, we affirm the chancery court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2.	Morgan Irby and Vivian Ramsey were friends and coworkers at Anderson Regional Medical Center. Irby owned a house located at 3804 30th Avenue in Meridian that she had acquired during a previous marriage. In 2016, Irby decided she did not want the house, nor could she afford the mortgage.[1] Irby offered to sell the home to Ramsey on a rent-to-own basis. Ramsey agreed, and on November 1, 2016, Irby prepared a six-page lease-to-own contract that she and Ramsey signed.

*Rent-to-Own Contract Terms*

¶3.	The lease term began on November 1, 2016, and ended on November 1, 2023.[2] Pursuant to its terms, Ramsey paid Irby monthly installments of $750.00 on the first day of each month. Irby agreed to credit $680.00 from each monthly payment toward the purchase price of the property, which was $104,000. Ramsey had the option to purchase the home at any time during or at the end of the lease period by paying the outstanding balance owed on the purchase price. The contract also provided that Ramsey and Irby would enter into a new

---

[1]  Irby had signed a deed of trust on February 4, 2013, to secure a promissory note in the original principal amount of $116,548.00. The note was to mature on February 10, 2023.

[2]  Irby testified that the promissory note included a balloon payment on her mortgage. The parties agreed that if Ramsey did not purchase the home by the time the balloon payment was due, the balloon amount would be refinanced in either her or Ramsey's name. During the term, however, Irby borrowed against another property she owned to satisfy the mortgage on the house Ramsey was purchasing, so that it was free and clear of any liens as of October 2022.

rent-to-own contract after Irby refinanced in 2023 if Ramsey had not purchased the home by the end of the contract. Even though the contract term ended on November 1, 2023, Irby and Ramsey both testified later that November 1, 2023, was not a deadline for Ramsey to purchase the home.

¶4. According to the rent-to-own contract, Ramsey paid utilities and maintained insurance for her respective interest in the property (i.e., renter's insurance on the contents), and Irby maintained insurance on the home itself. Ramsey was also responsible for any repairs because the parties intended that Ramsey would one day own the property. Irby was responsible for paying all taxes until ownership was transferred to Ramsey.

¶5. Between 2016 and 2022, Ramsey faithfully made her house payments and paid for house repairs, other than the outdoor siding, which Irby's insurance company required her to repair to maintain her home insurance. Ramsey also approached Regions Bank for a loan to exercise her option to purchase the house.

*Irby Sells Property*

¶6. Sometime in August or September 2022, Irby was approached by an interested buyer for the home. Irby said that at this time, she contacted attorney Patrick Stubbs to ask for advice regarding her contract with Ramsey. Stubbs is a transaction attorney who had completed a closing for her a year before. Stubbs said he had too much on his plate at the time to take on another case. According to Stubbs, Irby then asked what she should tell "the lady that's renting the house." Stubbs said he told Irby to send the renter a certified letter of

her intent to sell. When Irby told Stubbs of the interested buyer's offer, Stubbs made a higher purchase price, and Irby accepted. Irby testified that she gave Stubbs the rent-to-own contract prior to his purchase of the house.[3]

¶7.    On October 4, 2022, Stubbs formed Quackpot, a limited liability company of which Stubbs was the organizer and only member. Quackpot purchased the house from Irby on October 5, 2022, for $67,500. The deed conveying the house from Irby to Quackpot recited that "[t]his conveyance and the warranty hereof is further subject to all easements, roadways, servitudes restrictive covenants and oil, gas and other mineral reservations, exceptions, conveyances and *leases of record or obvious on reasonable inspection of the subject property*." Quackpot did not need to borrow money to purchase the house; however, Quackpot later borrowed $76,218.74 using the home as collateral, resulting in a lien on the property.[4] Ramsey testified that she learned of the sale when she tried to pay Irby October's rent, and Irby told her to send it to Stubbs, as he was the new owner of the home.

---

[3] Stubbs gave contradictory testimony about his pre-purchase knowledge of the rent-to-own contract. At first, Stubbs testified that he did not see Ramsey's rent-to-own contract until after the purchase when he visited the home, and Ramsey provided him with a copy. Stubbs said he then called Irby and tried to return the house, but Irby had already spent the proceeds and would not undo the transaction. However, later in his testimony, Stubbs said that Irby told him about the rent-to-own contract "weeks before" he purchased it. He admitted he had an opportunity to read and understand the rent-to-own contract but failed to do so, which he said was "absolutely" his fault.

[4] Stubbs did not need to encumber the property to finance the purchase at the time of the sale in October 2022. However, on November 4, 2022, Stubbs used the property to secure a $76,218.74 loan, with monthly payments of $657.81. Thus, after November 2022, there was a lien against the property that Ramsey had the option to purchase.

*Ramsey's Post-sale Contacts with Stubbs*

¶8.     On November 8, 2022, Ramsey delivered a letter to Stubbs, expressing her concern and confusion regarding the change in ownership and whether the change would affect her original contract with Irby.  After receiving this letter, Stubbs spoke with Ramsey, who told him that she had an attorney.  Stubbs emailed Ramsey's attorney explaining that future payments were to be made to him and stating that he attempted to assure Ramsey during their conversation that the original rent-to-own contract would remain the same.

¶9.     On November 16, 2022, Ramsey's attorney replied to Stubbs's email asking if Stubbs intended to assume the original contract and the agreed-upon terms between Irby and Ramsey.  Ramsey's attorney followed up on November 21, 2022, with a certified letter to Stubbs reminding him of details of the rent-to-own contract and pointing out that Ramsey had paid over $48,000 toward the purchase price of the home and that Ramsey intended to abide by the contract as written to ultimately purchase the home.

¶10.    On November 29, 2022, Stubbs responded via email stating that he had received the certified letter and that he was unaware of the exact terms of the contract when he purchased the home from Irby, but he offered to sign a new rent-to-own contract with Ramsey and personally finance Ramsey's purchase.  In his email, Stubbs compared his offer to a hypothetical bank loan offer using figures he said he had obtained from his personal bank. He calculated the hypothetical bank offer with a loan amount of $55,040 at an interest rate

of 8% over a thirty-year period at $722 per month.[5]  In comparison, he offered owner-financing at 6.35% interest rate over twenty years with no down payment and no mortgage insurance requirement, but the purchase price would increase from $55,040 to $70,000, and her monthly note would be $841.74.[6]  Ramsey did not accept this offer.

*Ramsey Sues*

¶11.    On December 9, 2022, Ramsey filed a verified complaint in the Lauderdale County Chancery Court against Irby, Stubbs, and Quackpot for a declaratory judgment and alleged claims of intentional or negligent infliction of emotional distress and mental anguish; intentional, gross, or negligent infliction of damages; injunctive relief; and specific performance.  Irby filed her answer on February 9, 2023, and Quackpot and Stubbs filed their answers on February 17, 2023.

¶12.    On March 17, 2023, Ramsey filed a motion to interplead her rental payments into the court while the litigation was pending.  At that point she had the rental payments from November 2022 through August 2023 to tender.[7]

¶13.    On March 23, 2023, Kimberly Walker, a mortgage loan originator for Regions Bank, approved Ramsey for a secured loan of $51,371.00 with an interest rate of 7.125%.  On April 18, 2023, Ramsey filed an affidavit in the chancery court case, giving Quackpot and Stubbs

---

[5]  The total of the payments over thirty years would amount to $259,920.

[6]  The total of the payments over twenty years would amount to $202,017.60.

[7]  Irby testified that she cashed the October rent check, and she took the amount of the October rent out of the final price of the home.

notice of her intent and readiness to purchase the house pursuant to the 2016 rent-to-own contract. She attached the bank's letter of approval. Neither Stubbs nor Quackpot responded. Thus, no closing date was set, and Ramsey did not purchase the house at this time. When later asked why the loan was not finalized and why the house was not purchased in April of 2023, Ramsey stated that she could not recall.

¶14. Irby filed a motion for mediation on July 5, 2023, in an attempt to expedite a resolution of the case. A notice of hearing for this motion was filed, but there is no order or notation of any actual hearing on the motion. On July 21, 2023, Ramsey filed a motion for a trial setting.

*Attempted Settlement*

¶15. On August 16, 2023, the parties appeared in court for a hearing on Ramsey's motion for a trial setting and motion to interplead funds into the court registry. After an informal conference in chambers, the parties announced on the record that they had reached a settlement, in which both parties agreed that the original contract between Irby and Ramsey was a valid and enforceable contract. The parties also agreed that rather than interpleading money into the court, Ramsey would give all money orders she was holding for the accrued rent to Irby ($7,500) and that Irby would turn them over to Stubbs. They further agreed that Ramsey would pay Stubbs the remaining purchase-price balance of $46,740.00 and that Quackpot would resolve its outstanding lien on the home upon receipt of the monies. Then Quackpot would deed Ramsey the home, leaving only her personal mortgage encumbering

7

it. During this hearing, Stubbs's attorney clarified that his clients would agree to this settlement as long as the home was purchased before November 2023. The court's express understanding was that Ramsey would purchase the house as soon as possible. It is not clear from the record whether the parties agreed that Stubbs, individually, would be dismissed from the suit. After the settlement was announced, Stubbs's attorney offered to draft a proposed agreed order.

¶16. Later on the day of this hearing, Ramsey's attorney emailed the other attorneys, informing them that Ramsey had gone to the bank that day to move forward on completing the paperwork needed for final approval to buy the home. First, the lender required the parties to execute a sales contract, the form of which the lender provided. The form contract included a clause concerning closing:

> CLOSING: Time being of the essence, closing shall be on or before September 30, 2023.

Ramsey's attorney filled in the blanks of the form contract, including the closing date and the "purchase price" section, which read:

> PURCHASE PRICE: The purchase price to be paid by the buyer shall be: $46,740 dollars, (the original price was $104,000, Buyer has paid $57,260 towards purchase) See Exhibit 2, Rent-to-own contract[.]

The form contract also contained a provision stating that "this contract and any attachments constituted the entire agreement between buyer and seller and supercede all prior discussions, negotiations, and agreements between the buyer and seller." Ramsey's attorney attached the completed contract to her August 16, 2023 email to opposing counsel.

8

¶17.   On August 19, 2023, Stubbs's attorney drafted a proposed chancery court order that he and Quackpot's attorney signed. He emailed this to Ramsey's attorney and explained that he had drafted the order "word for word" to memorialize the order of the court. On August 24, 2023, Ramsey's attorney replied that she disagreed with the proposed order and judgment because they did not accurately reflect the court's ruling or protect her client's interest, and she refused to sign.[8] In this email, Ramsey's attorney also explained that Ramsey was in the process of filing a motion with the court due to the delay in the receipt of the signed sales contract. The next day, Stubbs's attorney replied and explained that he would discuss the sales contract with Stubbs, but he would not enter into another contract with Ramsey until a final order was signed. Irby had also failed to sign the sales contract, saying that her signature would not be needed if Ramsey would sign an agreed order dismissing her from the suit.

¶18.   On August 25, 2023, Ramsey filed a motion to amend the court's August 16, 2023 oral ruling. In her motion, Ramsey explained the difficulty she was having getting Stubbs to sign the contract. She asked that Stubbs not be dismissed but remain a party in the lawsuit until all paperwork was signed, and she asked the court for its assistance.

¶19.   Over a month after receiving the sales contract, on September 26, 2023, Stubbs signed it and delivered it to Ramsey's attorney's office to prevent mail delay (as Stubbs claimed).

---

[8] Because of this disagreement, a transcript of the hearing was ordered. It was not produced until November 13, 2023.

9

The contract provided that the closing was to occur on or before September 30, 2023, with time being of the essence. The next day, Ramsey's attorney's office reached out to Stubbs asking him to re-sign the contract because Stubbs had handwritten a note at the bottom of the page regarding unpaid rent. The contract also had to be amended because additional rent was paid before the contract was signed, which affected the remaining balance and sales price of the house.

¶20. Ramsey's attorney prepared a second sales contract on October 5, 2023, and delivered it to Stubbs on October 6, 2023, along with a notification that there were additional payments to be picked up. Stubbs alleged that Ramsey's attorney brought him only the first page of the sales contract, as shown by the fact that his signature only appeared on the first page of the contract and not the final signature line. Despite this, Stubbs did not dispute the validity of this contract. Stubbs stated he had nothing to do with the contract clause that stated "time was of the essence" and required that closing now occur before or on October 25, 2023. This provision and closing date were in the contract when he received it. The bank's loan originator, Walker, received this contract on October 11, 2023, but it did not have both the buyer's and seller's signatures. Ramsey did not sign this sales contract until October 23, 2023.

¶21. On October 16, 2023, the bank ordered an appraisal, which was prepared and received by the bank on October 25, 2023. George Culpepper, a real estate and closing attorney, completed the title work on October 17, 2023, and the bank received it on October 24, 2023.

The appraisal was subject to repairs, which Ramsey completed within "a couple days." A final inspection was ordered on November 3, 2023, and was completed by November 9, 2023. Ramsey's loan originator Kim Walker received the final internal approval for the loan, subject to receiving additional FHA documents from the seller, on November 15, 2023. Walker approached the underwriter and asked for permission to have these and any other remaining documents signed at closing, which was approved, and a closing date was set for November 17, 2023. The underwriter did not require or request an addendum or amendment to the contract despite the fact that the October 25 closing deadline had passed.

¶22. On November 1, 2023, Stubbs received an email from Ramsey's attorney with FHA documents that he needed to sign. Stubbs testified that this was the first time he was made aware that Ramsey was still trying to purchase the property because the October 25 closing deadline had expired. On November 11, 2023, Ramsey filed a notice in the chancery court proceedings of a closing date and location, as well as an affidavit of lender approval and readiness to purchase.

¶23. On November 13, 2023, Ramsey filed an emergency motion for injunctive and other relief along with an amended notice of closing date and location for November 17, 2023, at Culpepper's office. The emergency motion sought to enforce the August 16, 2023 settlement agreement of the parties and asked the court to compel Stubbs to sign the necessary paperwork required for closing, attend the closing, and pay for attorney's fees.

¶24. On November 14, 2023, after receiving the transcript of the August 16, 2023 hearing

where the parties had settled and contacting the court, Ramsey's attorney redrafted the proposed August 16 agreed order that Stubbs's attorney had sent. She forwarded it to opposing counsel for review. Stubbs's attorney replied via email the next day, stating that neither he nor Quackpot would agree to the proposed order because "the facts and circumstances of this case have evolved substantially since August."

¶25. Upon receipt of this email on November 15, 2023, Ramsey's attorney filed an "Emergency Petition Requesting a Conference Call with the Court, Attorneys, and Court Reporter." In it, Ramsey stated she had circulated her draft of an order reflecting the ruling at the August 16, 2023 hearing and that opposing parties had refused to agree to it. She also noted her emergency motion for relief that she filed on November 13, 2023, and the need for the court's assistance "before she loses the opportunity to carry out the contractual terms to purchase the home."

¶26. On November 16, 2023, Quackpot replied to Ramsey's November 13, 2023 emergency motion, asserting that Ramsey had shown no reason why she could not have closed on or before October 25, 2023, as provided in the sales contract. Quackpot also contended that Ramsey had failed to complete the purchase by the November 1, 2023 deadline in the rent-to-own contract. Needless to say, the closing that was set for November 17, 2023, did not occur.[9]

---

[9] Given Quackpot's position that Ramsey had allegedly breached both the rent-to-own contract and the sales contract, Ramsey's attorney contacted the bank and told them she was having to go back to court with the seller, and the closing would not be held.

¶27. On November 16, 2023, after several emails among counsel, Ramsey filed a notice of hearing on her emergency motion for a conference call, setting it for December 7, 2023, at 8:15 a.m. Ramsey also filed a notice, setting the matter for trial on December 18, 2023.

¶28. On December 4, 2023, Ramsey filed a motion to enforce the trial setting. She recited the communications among the attorneys concerning their availability for trial and asked the court to confirm and enforce a December 18, 2013 trial date. Ramsey noticed this motion for December 7, 2023, at 8:15 a.m. as well. That same day, Irby filed a response to Ramsey's emergency motion and a motion to enforce the settlement and dismiss Irby as a party. Irby argued that she had done all she was required to do under the August 16, 2023 settlement agreement (i.e., receive and turn over rental payments to Stubbs) and that she should be dismissed as a party.

¶29. Despite the failed November 17, 2023 closing, Ramsey had not lost her lender's approval, and on December 6, 2023, Ramsey filed a notice of a new closing date on December 13, 2023. She also filed a second motion to interplead funds, alleging that Quackpot had claimed not to have received any rent for the months of September and October 2023, when, according to Ramsey, money orders had been delivered to Stubbs's office on October 6, 2023, along with the sales contract.

¶30. On December 7, 2023, the court entered an order setting the matter for trial on January 22, 2024. Apparently during the conference call hearing, the court ordered that Ramsey pay rental payments for November and December to Stubbs.

13

¶31.   On December 18, 2023, the court entered an order dismissing Irby as a party.

*Trial*

¶32.   Trial commenced on January 22, 2024. After one day, the court adjourned and took further testimony on February 5, 2024, and heard final arguments on March 4, 2024. At trial, several witnesses were called to testify, including Ramsey, Irby, Kim Walker, Stubbs (both in his individual capacity and on behalf of Quackpot), George Culpepper, and Gale Walker, Ramsey's attorney. Ramsey testified about the original contract between Irby and her, her interactions with Stubbs and Quackpot, as well as her efforts and the steps she had taken to attempt to purchase the house. Irby testified about the original contract between Ramsey and her as well as the sale to Stubbs.

¶33.   Kim Walker testified about the mortgage and loan processes and progress that had been made on behalf of Ramsey to attempt to purchase the home. She explained that when Ramsey obtained pre-approval in March 2023 and again in August 2023, the underwriter had reviewed Ramsey's income, asset documents, and credit, and underwritten the file pending a sales contract. She explained that after the bank received a sales contract, the bank would lock in the interest rate and order the appraisal and title work. In this case, Kim testified, it took from August 4, 2023, to October 11, 2023, for her to get the sales contract. She also testified that in a standard situation, it usually took thirty to forty-five days from receipt of the contract to the time of the closing. She stated that this was "kind of an urgent situation," and they "pushed it relatively expediently." This loan was finally approved on November

14

15, 2023. Kim acknowledged that the sales contract expired on October 25, 2025, but she insisted it was not unusual for a loan to close with an expired contract. Sometimes, underwriters asked for an extension or addendum to an expired contract, but in this case the underwriter did not require it. Kim stated that she was not sure who canceled the closing, but it was canceled because they did not have confirmation that the seller was going to be there. However, because all the documents needed were signed by the time of the trial, Kim said that the closing could be held on January 24, 2024 (two days from the date she testified).

¶34. Stubbs testified individually and on behalf of Quackpot about his purchase of the home from Irby, the rent-to-own agreement, and the October 6, 2023 sales contract. He testified that he wanted Ramsey to have the house and that he intended to follow the settlement agreement that the parties made on August 16, 2023. But on the advice of counsel, he did not sign the sales contract when it was first presented to him because Ramsey's attorney would not sign the agreed order presented to her that would have dismissed him individually. Thereafter, Stubbs testified that he signed documents presented to him, including the October 6, 2023 contract with the closing date of October 25, 2023, but he never heard anything further. On November 1, 2023, when he was at the bank to make a deposit, the banker mentioned that he saw that Stubbs was selling the house. Stubbs asked him how he knew, and the banker told him that the closing attorney had inquired about the mortgage pay-off. At that point, Stubbs called his attorney because he thought the contract terminated on November 1. Stubbs took the position that as of November 1, 2023, when

15

Ramsey had not purchased the home per the rent-to-own contract, Ramsey became a month-to-month tenant with no option to purchase. However, he acknowledged that on that same date, November 1, 2023, Ramsey's attorney emailed him the FHA documents to sign. Stubbs testified that he would be willing to sell Ramsey the home, and had previously offered to, but not at the price in the rent-to-own contract. Stubbs knew that he would lose money if he had to sell Ramsey the home at the rent-to-own contract price, saying that he would need $7,000 for the closing to pay off his own mortgage. However, he stated that no one ever contacted him about the closing or what he needed to bring.

¶35. George Culpepper testified about the sales contract with its closing-date provision and the title work he completed. He stated he was ready to close on October 25, 2023, but the bank was not ready. He said he was notified by the bank that the closing would be on November 17, 2023, and that his secretary would have contacted Stubbs to get the payoff of the outstanding mortgage. Gale Walker testified about her request for $36,635 in attorney's fees and her belief that the controversy between the parties could have been resolved much earlier if Stubbs had only signed the order from the August 16, 2023 hearing. Austin Terry, who represented Stubbs individually, testified that he charged a flat fee of $2,000, though he had worked fifty to sixty hours on the case.

¶36. Thirty-two exhibits were entered during the trial: the contracts, emails, deeds, and other relevant documents. After Ramsey rested, Stubbs moved for an involuntary dismissal based on the "time is of the essence" issue, which the chancery court denied. *See* M.R.C.P.

41(b). After two days of a bench trial and, later, one day of oral arguments, the judge adjourned, stating that he would issue a written opinion.

*Chancery Court Opinion*

¶37. On March 5, 2024, the chancery court issued a written judgment. The court found that the original rent-to-own contract was and remained valid and "binding on Quackpot/[Stubbs] as the current owner succeeding to the rights and obligations of the prior owner [Irby]." Regarding the delay in closing, the court refused to place blame on one party over the other due to the contributions of both parties and even the court itself. The court stated that equity "cried out" for relief for Ramsey because this was her home that she had paid for diligently since 2016. The court granted a declaratory judgment and ordered Quackpot to comply with the contract terms by taking all steps necessary to complete the sale. The court denied the additional relief Ramsey requested.

*Appeal*

¶38. Stubbs and Quackpot filed a notice of appeal on March 7, 2024. They claim that the chancery court should have enforced the expiration date of the rent-to-own contract (November 1, 2023) and terminated any rights Ramsey had under it. They further argue that the chancery court should have found that Ramsey had materially breached the October 6, 2023 contract by not closing by the October 25 closing date. Stubbs and Quackpot also contend that the trial court ignored the law in order to provide an equitable remedy to Ramsey.

17

**STANDARD OF REVIEW**

¶39.    "Th[is] Court will not disturb a chancellor's findings if they are supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." *Martin v. Williams*, 172 So. 3d 782, 785 (¶7) (Miss. Ct. App. 2013). "Findings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence." *Copeland v. Copeland*, 235 So. 3d 91, 94 (¶5) (Miss. 2017). We apply a de novo standard of review to questions of law, including the grant of a declaratory judgment. *Virden v. Campbell Delong LLP*, 371 So. 3d 1256, 1259 (¶16) (Miss. 2023) (quoting *S.C. Ins. Co. v. Keymon*, 974 So. 2d 226, 229 (¶8) (Miss. 2008)).

**DISCUSSION**

¶40.    Although this case involves three contracts, the first and primary one is the rent-to-own contract Irby and Ramsey signed that gave Ramsey the "exclusive option" to purchase the house at a set price. It is undisputed that this contract contained no "time is of the essence" provision and was assumed by Quackpot after it purchased the house from Irby. The two other contracts, the "August 16, 2023 Sales Contract" and the "October 6, 2023 Sales Contract," which contained closing dates and noted that "time was of the essence," were required by Ramsey's lender during her attempts to exercise her right to purchase the home pursuant to the rent-to-own contract.

   I.    **Whether the chancery court erred in declaring that the rent-to-own contract was and remained valid and binding on Quackpot despite**

18

**the November 1, 2023 expiration date.**

> A. *The rent-to-own contract bound Quackpot during the contract term.*

¶41. Stubbs concedes that he was aware of Ramsey's rent-to-own contract when Quackpot purchased the home from Irby. Irby testified that she told him about the contract; Ramsey said she showed it to him; and even Stubbs agreed he was given a copy but did not read it. Ignorance of its contents does not excuse his or Quackpot's obligation to honor it. A purchaser is required to fully investigate all facts related to the property purchased, *Harrell v. Lamar Co.*, 925 So. 2d 870, 876 (¶17) (Miss. Ct. App. 2005), and is charged with notice, "equivalent in law to knowledge, of all those further relevant facts which such inquiry, if pursued with reasonable diligence, would have disclosed." *In re Est. of Wheeler*, 958 So. 2d 1266, 1273 (¶26) (Miss. Ct. App. 2007). Thus, the chancery court did not err by holding the rent-to-own contract was binding on Quackpot when it became the owner of the property.

> B. *The rent-to-own contract was still binding on Quackpot despite the November 1, 2023 termination provision.*

¶42. Although Quackpot concedes it may have been bound by the rent-to-own contract during the term, it argues that the chancery court erred in finding that the rent-to-own contract was still enforceable when by its unambiguous terms, the contract expired on November 1, 2023, and Ramsey had not completed the purchase of the home by that date. Ramsey responds that other terms and provisions in the contract made the contract ambiguous, so the court properly admitted parol evidence to determine the intent of the

19

parties regarding the meaning and impact of the termination date on Ramsey's rights under the rent-to-own contract. We find that it is unnecessary to apply the tenets of contract interpretation because it is undisputed that Ramsey had the right to purchase the home under the rent-to-own contract, and she made arrangements for that purchase before November 1, 2023. Moreover, because there was no "time is of the essence" provision in that contract, she had a reasonable time after the termination date to complete the purchase.

¶43. Our decision in *Haidar v. Margetta*, 352 So. 3d 206 (Miss. Ct. App. 2022), is on point. There, we reiterated that "time will be deemed essential to a contract only in limited circumstances." *Id*. at (¶13) (quoting *Ferrara v. Walters*, 919 So. 2d 876, 884-85 (¶¶24-25) (Miss. 2005)). In that case, the parties agreed to the sale of property and set a specific closing date. *Id*. at 207 (¶1). However, due to delays caused by the purchasers' lender, they were unable to close on that date. *Id*. A new closing date was set, but the seller refused to honor the contract. *Id*. The purchasers sued, and the seller filed a motion to dismiss, arguing that the purchasers had breached the contract by not closing on the first date set. *Id*. at 208 (¶6). The purchasers responded that they had not breached the contract because "time was not of the essence to the contract." *Id*. Agreeing with the seller, the chancery court dismissed the case, and the purchasers appealed. *Id*. at (¶8).

¶44. On appeal, this Court held that the chancery court erred in dismissing the case because the contract did not contain a "time is of the essence" clause, *id*. at 209 (¶14), and the seller never gave the purchasers clear notice or warning that it would consider the failure to close

20

on a date certain as a default that terminated the contract, *id*. at 212 (¶19). Concerning land

contracts, we stated:

> As one treatise on this subject recognizes, "[i]n the majority of real estate transactions, the parties do not intend to jeopardize their rights to perform a contract by failure to meet the contract's specified time for closing." 14 Richard R. Powell, Powell on Real Property § 81.03[5], at 113 (Michael Allan Wolf ed., 2003). "They do not view the date as a deadline but rather as a goal to be reached unless some unavoidable delay forces its postponement for a reasonable time." *Id*.

*Id*. at 209 (¶11). We further stated:

> To be sure, contracting parties may agree that time is "of the essence" to their contract. "[W]hen the parties agree that time is of the essence in their contract, a delay in performance beyond the specified time will constitute a material breach" and generally will excuse further performance by the other party. 14 Richard A. Lord, Williston on Contracts § 43:7 (4th ed. Oct. 2022 update). But if time is not of the essence, then a slight delay in performance will not be deemed a material breach, and "performance must occur within a reasonable time." *Id*.; *accord* Powell, *supra,* § 81.03[5], at 112-13 ("As long as a tardy plaintiff is able to tender performance within a reasonable time, that party is eligible for specific performance of the contract despite the failure to meet the original time for performance."); Alan M. Weinberger, Real Estate Contracts, in 12 Thompson on Real Property § 99.15(d), at 293 (David A. Thomas ed., 1994).

*Id*. at (¶12). We noted that the seller never expressed any concern about the delay or

attempted to impose a firm deadline to make time be of the essence in their contract. *Id*. at

212 (¶19).

¶45.    Similarly, in this case, the rent-to-own contract contained no "time is of the essence"

provision, nor did Stubbs and Quackpot indicate that closing had to be completed by

November 1, 2023. They may claim that during the August 16, 2023 hearing, their attorney

21

stated that the settlement was contingent on the completion of the purchase before November 2023. However, that settlement agreement was never finalized or ordered by the court. Indeed, because the settlement fell through, the chancery court held a trial on the merits of Ramsey's complaint. Thereafter, Stubbs and Quackpot signed the August 16, 2023 sales agreement and readily signed a second one on October 6, 2023, when the closing date under the first agreement could not be met. Stubbs made no demand that the sale close by the October 25, 2023 date contained therein or by November 1, 2023. Therefore, because time was never of the essence in the rent-to-own contract and because Quackpot gave no notice or warning that failure to close by November 1, 2023 would result in default, Ramsey was entitled to a reasonable time after November 1, 2023, to complete the purchase process.

¶46. In addition, the record supports the chancery court's finding that the failure to finally close was no one person's fault. Ramsey had complied with the terms of the rent-to-own contract, being current and timely with all her payments. Certainly there were missed opportunities beginning in April 2023 when Ramsey filed her affidavit of intent and readiness to purchase the home with the bank approval attached.[10] Had Stubbs agreed to

---

[10] Ramsey testified that she had provided the bank with all the information it needed concerning her finances, income, and credit. The bank's March 23, 2023 approval letter reads:

> Congratulations! We are pleased to inform you that we have *approved* your loan application subject to our receipt and approval of the items listed on the attached Conditions Addendum. This *approval* is for the loan terms and property listed below: . . . .

All that was needed were things the bank would generate, like the appraisal and title search.

proceed to closing then, Ramsey would have purchased the home before November 1, 2023.

¶47.   In August 2023, Stubbs had another opportunity to enable Ramsey to meet the November 1, 2023 deadline had he promptly signed the August 16, 2023 contract rather than holding it for over a month, until September 26, 2023, and signing it only four days before the closing date. This failure necessitated a new contract on October 6, 2023, with an unrealistic closing date of October 25, 2023, a mere nineteen days later.[11]   The bank's processing procedures took the parties beyond that date, making it temporarily impossible for the parties to close by that date.  We have held:

> [W]here one party having the right to demand performance stands ready and willing to carry out an executory contract but the other party cannot perform due to a temporary impossibility, the passing of the designated date for performance does not result in voiding the contract.  Rather, that event simply extends the time of performance appropriately until the impossibility ceases.

*In re Est. of Pickett*, 879 So. 2d 467, 471 (¶11) (Miss. Ct. App. 2004).[12]   In the case at hand, when Ramsey's  bank received all the materials it required, the impossibility ceased, and Ramsey was ready for closing on November 17, 2023, which was certainly within a reasonable time after November 1, 2023, to complete the purchase.  Accordingly, the

---

[11]   Witnesses familiar with the closing process (Kim Walker, Culpepper, and even Stubbs) testified that it usually took thirty to forty-five days to receive all the necessary documents and close.

[12]   In that case, the parties executed a contract for the sale of property, but the seller died before the closing date for the sale.  *Id*. at 459 (¶3).  The closing date could not be met due to problems with probating the seller's will.  *Id*. at (¶5).  This Court held that under these circumstances, the chancellor was correct in concluding that the contract had not lapsed for its failure to close by the closing deadline.  *Id*. at 471 (¶13).

chancery court did not err in finding that the contract still bound Quackpot to close on the property's sale even after November 1, 2023, because all was ready for closing within a reasonable time thereafter.

¶48. In addition, looking at the unambiguous terms of the rent-to-own contract, as Stubbs and Quackpot urge, we see that the contract only required that Ramsey exercise her option at any time during the contract, even at its end, and did not require that she actually close on the transaction by November 1, 2023. The "Option to Purchase" provision read:

> **Option to Purchase**
>
> Tenant upon satisfactory performance of this agreement, shall have the option to purchase the property at any time during the contract or own the property at the end of the tenancy period described, provided that the tenant is not in default of the Lease Agreement. *Thereafter,* each of the parties shall promptly execute any and all further instructions or other documents including a Sale Agreement which may be reasonable required for purchase of the property.

Pursuant to this language, Ramsey clearly exercised her option during the term when she obtained financing approval in March 2023, and she gave Stubbs and Quackpot notice of her readiness to complete the transaction. In addition, under the contract, she could have exercised the option at the end of the lease. Under the "Rights" clause, the contract read:

> Tenant is depositing $1500.00 with the homeowner for the right to exercise this option *at the end of the lease term.*

(Emphasis added). Moreover, the rent-to-own contract only indicated that the *contracts for sale* would be completed, not that the purchase would be closed, providing:

> This agreement does not constitute a contract for sale; a separate contract for sale will need to be entered into and executed pursuant to the law of the State

24

of Mississippi *at the end of the tenancy period.*

(Emphasis added). Thus, the rent-to-own contract itself did not require that the sale of the home be completed by November 1, 2023.

¶49. In summary, because time was not of the essence in the rent-to-own contract and because Ramsey exercised her option during the term of the contract, she was entitled to a reasonable amount of time past November 1, 2023, to complete the purchase. A proposed closing date of November 17, 2023, was within that reasonable amount of time. Accordingly, the chancery court did not err in finding that the rent-to-own contract was still binding on Quackpot after November 1, 2023, and required Quackpot to complete the purchase.

II. **Whether the chancery court erred by not finding Ramsey in breach of the October 6, 2023 sales contract.**

¶50. Quackpot views the October 6, 2023 sales contract in isolation and contends that the chancery court erred in not finding that Ramsey breached the express "time is of the essence" clause contained in it by failing to close by the October 25, 2023 closing date. Alleging this to be a material breach, Quackpot asserts that it is excused from any further performance. We disagree.

¶51. First, the two sales contracts executed by the parties were not original, stand-alone, negotiated contracts. They merely facilitated Ramsey's exercise of her option to purchase under the rent-to-own contract, which contained no "time is of the essence" provision and which made no reference to completing the purchase or closing before November 1, 2023.

Specifically, the rent-to-own contract stated, "[E]ach of the parties shall promptly execute any and all further instructions or other documents including a Sale Agreement which may be reasonably required for purchase of the property." Therefore, these later sales contracts do not affect our ruling that the rent-to-own contract is still enforceable.

¶52. Additionally, those sales contracts were form contracts required by the bank with information relating to the particular transaction written in the blanks. The phrase "time is of the essence" appeared in the documents' boilerplate language and was not a term that the parties negotiated or requested. We held in *Haidar* that *when the parties agree* that time is "of the essence" in their contract, then a delay in performance beyond the specified time may breach the contract. *Haidar*, 352 So. 3d at 209 (¶12). There is no evidence in the record that either Ramsey or Quackpot insisted that time be of the essence in the contract.

¶53. Even if the October 6, 2023 contract exhibited a time-is-of-the-essence provision applied, there was no material breach when that closing date was not met. The Mississippi Supreme Court has held that "[b]ecause terminating a contract is viewed as an extreme remedy and should be granted sparingly, termination of the contract is not proper absent a material breach." *Ferrara*, 919 So. 2d at 886 (¶29) (quoting *UHS-Qualicare Inc. v. Gulf Coast Cmty. Hosp. Inc.*, 525 So. 2d 746, 756 (Miss. 1987)).

> A breach is material where there is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats [the purpose of the contract].

*Id*. In *Ferrara*, the only reason the parties did not close as provided in their property sale

26

agreement was because of a title defect, which the seller had not cured. *Id*. at (¶30). The

Court held that a purchaser's refusal to close because of this was not a material breach. *Id*.[13]

¶54.    In the case at hand, as noted above, the chancery court found no material breach in the

failure to close by certain dates, stating that the "reasons for the failure to meet all loan

closing requirement and get to a final closing is not on any one person or entity." We will not

disturb a chancellor's findings following a trial unless the findings are manifestly wrong,

clearly erroneous, or an erroneous legal standard was applied. *Towns v. Panola Cnty. Bd.

of Supervisors*, 357 So. 3d 1062, 1070 (¶17) (Miss. Ct. App. 2022).  Here, the record

supports the chancery court's findings concerning the lack of fault for the failure to close.

Quackpot delayed signing the August 16, 2023 contract, requiring another contract in

October.  The bank failed to order the items it needed for closing (i.e., title search, appraisal,

and inspection) in September when it received the first executed sales contract; instead, the

bank waited until the second one was signed and then ordered them one after the other.  Even

the court shouldered some responsibility, stating that it could have set a date certain for

completion of the purchase during the August hearing.  Substantial credible evidence in the

record supports the court's finding that no one party was to blame for the failure to close and,

---

[13] We note that the sales agreement in *Ferrara* did not contain an express "time is of the essence" clause, *id*. at 885 (¶25), which we noted as one circumstance when time could be deemed essential. *Id*. at 884-85 (¶¶24-25).  However, this case is distinguishable from other cases where the parties negotiated such a clause in their sales agreement because, here, the October 6, 2023 contract was executed pursuant to, and as a necessary condition of, the overriding rent-to-own contract, which did not have a "time is of the essence" requirement.

thus, there was no material breach of the sales contract by Ramsey when the closing date was not met.

¶55. In summary, we hold that the October 6, 2023 sales contract merely implemented the rent-to-own contract, which did not contain a time-is-of-the-essence provision. Because Ramsey was entitled to complete the purchase within a reasonable time under the rent-to-own contract, which she attempted to do, and because she did not materially breach the October 6, 2023 contract, the chancery court did not err in requiring Quackpot to honor both contracts and close on the property.

### III. Whether the court ignored the law in order to provide what it considered to be an equitable remedy to Ramsey.

¶56. Lastly Quackpot argues that in trying to grant Ramsey equitable relief, the chancery court failed to follow established law. We disagree and have already discussed the principles of law that the chancery court correctly followed when enforcing the contracts in this case. Moreover, we recognize that the purchase price of the home was $104,000 and that at the time of the chancery court's order, Ramsey owed $42,660. While equity must follow the law, it also "abhors a forfeiture." *Camille Village LLC v. Fed. Nat'l Mortg. Assoc.*, 334 So. 3d 46, 55 (¶37) (Miss. 2022) (quoting *Maxey v. Glindmeyer*, 379 So. 2d 297, 300 (Miss. 1980)). Moreover, "[a] court of equity is a court of conscience." *Brown v. Blue Cane Cowart Tippo Water Ass'n Inc.*, 309 So. 3d 478, 488 (¶37) (Miss. Ct. App. 2019); James. W. Shelson, Mississippi Chancery Practice § 2:17 (2024-2025 ed.). The chancery court could not in good conscience render a judgment that would result in Ramsey forfeiting the purchase

payments she faithfully made. In addition, the chancery court made a legal finding that the failure to close was no one person's fault. Because under the law, Ramsey had a reasonable amount of time to complete the purchase of the home, we affirm the chancery court's equitable relief requiring Quackpot to comply.

## CONCLUSION

¶57. For the above reasons, the chancery court's judgment granting final declaratory and injunctive relief is hereby affirmed.

¶58. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**